## FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRENDAN MCKOWN, a single
individual,
                    *Plaintiff-Appellant,*

            v.

SIMON PROPERTY GROUP INC, a
Delaware corporation doing
business as Tacoma Mall; IPC
INTERNATIONAL CORPORATION, an
Illinois corporation,
                    *Defendants-Appellees.*

No. 11-35461

D.C. No.
3:08-cv-05754-BHS
Western District of
Washington,
Tacoma

ORDER

Filed August 6, 2012

Before: Ronald M. Gould, Jay S. Bybee, and Carlos T. Bea,
Circuit Judges.

---

### COUNSEL

Darrell L. Cochran (argued), Jason P. Amala, Pfau Cochran
Vertetis Amala PLLC, Seattle, Washington, for the plaintiff-
appellant.

T. Jeffrey Keane, Keane Law Offices, Seattle, Washington,
for the defendants-appellees.

**ORDER**

For the reasons explained below, we respectfully certify to the Washington Supreme Court the following questions:

1) Does Washington adopt Restatement (Second) of Torts § 344 (1965), including comments d and f, as controlling law? *See Nivens v. 7-11 Hoagy's Corner*, 943 P.2d 286 (Wash. 1997).

2) To create a genuine issue of material fact as to the foreseeability of the harm resulting from a third party's criminal act when the defendant did not know of the dangerous propensities of the individual responsible for the criminal act, must a plaintiff show previous acts of similar violence on the premises, or can the plaintiff establish reasonably foreseeable harm through other evidence? *See Wilbert v. Metro. Park Dist. of Tacoma*, 950 P.2d 522 (Wash. Ct. App. 1998); *see also Fuentes v. Port of Seattle*, 82 P.3d 1175 (Wash. Ct. App. 2004); *Craig v. Wash. Trust Bank*, 976 P.2d 126 (Wash. Ct. App. 1999); *Raider v. Greyhound Lines, Inc.*, 975 P.2d 518 (Wash. Ct. App. 1999); *cf. Nivens*, 943 P.2d 286; *Christen v. Lee*, 780 P.2d 1307 (Wash. 1989); *Passovoy v. Nordstrom, Inc.*, 758 P.2d 524 (Wash. 1988), *review denied*, 112 Wash. 2d 1001 (1989); *Miller v. Staton*, 365 P.2d 333 (Wash. 1961).

3) If proof of previous acts of similar violence is required, what are the characteristics which determine whether the previous acts are indeed similar?

\* \* \*

The acts of violence underlying this tort case are horrific. On November 20, 2005, Plaintiff-Appellant Brendan McKown was shot and injured by Dominick S. Maldonado inside the Tacoma Mall during Maldonado's eight-minute shooting rampage. At the time, McKown was working in one of the stores in the Mall. Co-Defendant-Appellee Simon Prop-

erty owned the Mall, and IPC International, the other co-defendant-appellee, contracted with Simon to provide security services at the Mall. In Washington state court, McKown brought state law negligence claims against the defendants to recover damages for his injuries, and the defendants removed to federal court on grounds that there was diversity jurisdiction.[1] The district court granted summary judgment to the defendants, and McKown appealed to our court.

While we are conscious of the very real human suffering presented in this case, the questions with which we are confronted would be perfect for a first-year torts exam. What is the scope of the defendants' duty to protect McKown from harm from such a shooting? Were these acts of violence foreseeable to the defendants? In answering these questions, we must look to Washington law. But, as we explain below, we are unsure of what the answers are. We therefore certify the above questions to the Washington Supreme Court in the hope that the court will honor our request and clarify these important and recurring questions.

## I.

Because this is an appeal from a grant of summary judgment to the defendants, we relate the facts in the light most favorable to McKown as the nonmoving party. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004).

## A.

On November 20, 2005, a man named Dominick S. Maldonado walked into the Tacoma Mall, in Tacoma, Washington. Maldonado was wearing a trench coat and carrying a concealed MAK-90 rifle, a concealed Intertec Tec-9 pistol, and a guitar case containing ammunition. After entering the

---

[1]McKown also brought contract claims against the defendants, but he does not press those on appeal.

mall, Maldonado stopped near a soda machine and loaded his rifle, passed by a T-Mobile kiosk multiple times, and then began shooting. Over a period of approximately eight minutes, Maldonado injured seven people, the last of which was McKown.

McKown's injuries occurred in the course of his attempt to intervene. McKown, who was legally armed with a handgun, had been hiding in a store with several other people when he saw Maldonado. Here is McKown's harrowing account of what occurred next:

> [Maldonado] turned, I got my hand in here. . . . I [said] . . . young man, I think you need to put your weapon down. He spins around, I draw and right as I aim and I'm pulling the trigger back, first shot hits me in the abdomen. Kicks my gun arm into the air. Kicks out and contorts my legs into uncomfortable, unduplicatable [sic] positions like up and out and up and back. And I'm trying to bring my gun arm down and I prayed the most un-Christian prayer of my life, which was: "please, God, let me shoot this guy before he kills somebody else." . . . [The pain] was horrible, horrible. . . .

> So point is, I'm trying to bring my gun arm down to shoot him. You know, I'm thinking I'm doing my dying actions here, and then he hits me again and again and again and again. . . .[2]

Maldonado then took several people as hostages in a Sam Goody record store for several hours, but he was eventually taken into custody. McKown was left paralyzed. Maldonado was convicted of several crimes of violence and sentenced to 163 years in prison.

---

[2]For clarity, some punctuation has been altered from that in the deposition transcript.

Simon Property owns the Tacoma Mall, a 1.3 million-square-foot shopping center located in Tacoma, Washington. In September 1999, Simon and IPC had entered into a "Security Services Contract" to provide security at the mall. In January 2003, the contract was renewed, and it was then amended in 2004. Under the contract, IPC was to provide "security services and equipment at the [Mall]."

### B.

On November 12, 2008, McKown filed a complaint against Simon and IPC in Pierce County Superior Court in the state of Washington, and the defendants removed to federal district court based on diversity. In his complaint, McKown alleged five state law causes of action against defendants: (1) failure to protect tenants and business invitees from foreseeable criminal conduct; (2) negligent rendering of security measures and services; (3) negligent performance of undertaken duty; (4) negligent hiring and/or failure to employ security personnel; and (5) breach of express and/or implied contract.

Each defendant moved for summary judgment. The district court first granted IPC's motion and dismissed all claims against IPC. The district court held that IPC owed no duty of care to McKown because McKown failed to show that McKown's status as a business invitee of Simon, for whom IPC contracted to provide security services, created a "special relationship" between IPC and McKown. McKown filed a motion for reconsideration, which the district court denied.[3]

However, the district court denied Simon's motion for summary judgment regarding the tort claims. The district court

---

[3]Western District of Washington, Local Rule CR 7(h) provides: "*Standard.* Motions for reconsideration are disfavored. The court will ordinarily deny such motion in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence."

held that the issues of foreseeability of the criminal acts and Simon's proximate cause for McKown's injuries were issues for the jury. The district court stated that it could not conclude that Maldonado's shooting was "so highly extraordinary or improbable as to be wholly beyond the range of expectability," (quoting *Christen*, 780 P.2d at 1313); thus, it could not conclude that the shooting was unforeseeable as a matter of law.

Simon filed a motion for reconsideration. The district court granted Simon's motion in part on the ground that the court had overlooked case law from Washington state intermediate appellate courts delimiting a "prior similar acts on the premises test" to determine whether foreseeability of third-party criminal conduct is a question for the jury. To address this standard, the district court gave McKown the opportunity to file additional briefing to present "evidence of relevant prior similar acts."

McKown presented in his supplemental briefing the declaration of Darrell L. Cochran, McKown's attorney, and eighty-six pages of exhibits, including news articles, police incident reports, and court records as evidence of six shootings and three other incidents involving guns at the Tacoma Mall. McKown, the non-moving party, summarized this evidence as follows:

> Between 1992 and 2005, the Tacoma Mall was the location of six separate shootings:
>
> • In May 1992, mall security ejected two groups of men who were arguing inside the Tacoma Mall. As one group waited at the Mall's bus center, the other group drove by and fired six to eight shots.
>
> • In November 1992, a young man was shot several times in the Tacoma Mall parking lot. His

friends drug [*sic*] him through the Mall, leaving a trail of blood.

- In March 1993, another young man was shot in the Tacoma Mall parking lot as he walked up to a car. The wounded man staggered into the Mall. In its news report of the shooting, the News Tribune noted that three months earlier a man had reported to the police that he had been robbed at gunpoint outside the Sears store at the Mall.

- In August 1994, up to thirteen shots were fired at the Tacoma Mall. The News Tribune reported that "[b]ullets flew inside the Tacoma Mall on Saturday, hitting within feet of scattering shoppers."

   The Pierce County prosecutor testified that "three uninvolved witnesses were in the direct line of fire and they all dove for cover." She also noted that "[t]here were 13 shell casings found in the parking lot at the Mall and one entrance door was shattered. At least five bullets struck the entrance area of the Mall." When one of the shooters was sentenced, he was ordered to pay restitution to the Tacoma Mall and was ordered to have no contact with the Tacoma Mall.

- In October 1996, a gunman shot and wounded a man as he ran into the lobby of the movie theater at the Tacoma Mall. The man did not know who shot him. In response to the shooting, the Tacoma Mall's managers told the News Tribune that they had implemented a "crisis-management plan" and intended to hold a meeting with the Mall's owners "to review security measures to determine if they can be improved."

- In March 2000, five youths were arrested after they fired shots in the Tacoma Mall parking lot.

Simon also knew or should have known of other incidents involving guns at the Tacoma Mall in the years leading up to the shooting at issue:

- In November 2001, Tacoma Police responded to a woman who was carjacked at gunpoint in the parking lot of the Tacoma Mall.

- In March 2003, Tacoma Police responded to a man who was robbed at gunpoint in the Tacoma Mall parking lot while waiting for his girlfriend.

- In February 2005, Tacoma Police responded to a man who had a gun pointed at him in the Tacoma Mall parking lot.

The district court granted Simon's motion for reconsideration and its motion for summary judgment on McKown's negligence claims. It concluded that "McKown [had] failed to submit competent evidence of random acts of indiscriminate shootings on Simon's premises" as required by the "prior similar acts on the premises test." The district court found that the incidents McKown described were (1) too remote in time, with the most recent shooting occurring five years prior to Maldonado's shooting; (2) too dissimilar in location because all the incidents occurred outside rather than inside the mall; and (3) too dissimilar in nature because the prior incidents involved violence directed toward a specific person rather than at random people.[4]

---

[4]Because the district court addressed all of McKown's evidence and did not rule any of it inadmissible, we assume that all of McKown's evidence of prior acts may properly be considered at this stage in the litigation.

McKown timely appealed the district court's adverse orders.

## II.

The district court had diversity jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291.

We review grants of summary judgment de novo and determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004) (internal quotation marks omitted).

Washington law authorizes the Washington Supreme Court to accept certified questions from the federal courts. Wash. Rev. Code § 2.60.020. We have previously certified questions to the Washington Supreme Court where a question of law " 'has not been clearly determined' by the Washington courts" and where "the answer to [the] question is outcome determinative." *Bylsma v. Burger King Corp.*, 676 F.3d 779, 783 (9th Cir. 2012) (quoting Wash. Rev. Code § 2.60.020). Certification is especially appropriate where the issues of law are complex and have "significant policy implications." *Perez-Farias v. Global Horizons, Inc.*, 668 F.3d 588, 593 (9th Cir. 2011).

## III.

In this appeal, McKown argues that Washington law establishes two separate business owner duties to its invitees, both of which were breached by Simon and IPS: the duty to observe and the duty to intervene. McKown further argues that the district court erred by concluding that Maldonado's shooting was not foreseeable as a matter of law under either duty. As explained below, we cannot answer this question

because the scope of the foreseeability inquiry under Washington law is not sufficiently clear to us. Thus, we conclude that certification of the questions stated above is necessary.

Since we are sitting in diversity, "we must begin with the pronouncements of the state's highest court, which bind us." *Hilton v. Hallmark Cards*, 599 F.3d 894, 905 (9th Cir. 2010). Neither party disputes that Washington law applies. We must also keep in mind that *only* the Washington Supreme Court's decisions are binding, and "[i]n the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions," among other sources of authority, "as guidance." *Nelson v. City of Irvine*, 143 F.3d 1196, 1206 (9th Cir. 1998) (internal quotation marks omitted).

A.

To show negligence under Washington law, "the plaintiff must prove duty, breach, causation, and damages." *Nivens*, 943 P.2d at 289. The key issue in this case is whether Simon owed a duty to protect McKown from the criminal acts of Maldonado. Whether a duty exists is a question of law. *Id.*

In *Nivens*, the Washington Supreme Court held that a business owner owes a duty to its invitees to protect them from harm arising from third persons because "a special relationship exists between a business and an invitee." *Id.* at 291-92. Here, Simon conceded that McKown was a business invitee. Therefore, Simon owed a duty to McKown to protect him from harm by third persons. *Id.* at 292-93.

It is the scope of that duty that is dispositive. The Washington Supreme Court, in *Nivens*, adopted Restatement (Second) of Torts § 344 (1965) to delimit the nature and scope of the duty owed by a business to its invitees. *Id.* at 292-93. *Nivens*, quoting the Restatement, says:

> *A possessor of land* who holds it open to the public
> for entry for his business purposes *is subject to lia-
> bility* to members of the public while they are upon
> the land for such a purpose, *for physical harm
> caused by the accidental, negligent, or intentionally
> harmful acts of third persons* or animals, *and by the
> failure of the possessor to exercise reasonable care
> to*
>
> (a) *discover that such acts are being done or are
> likely to be done*, or
>
> (b) *give a warning adequate to enable the visitors to
> avoid the harm, or otherwise to protect them against
> it.*

*Id.* at 292 (emphasis added).

The *Nivens* court also appeared expressly to adopt com-
ments d and f to § 344 to describe the limits of the duty owed.
*Id.* In relevant part, the court stated that a possessor of land,
although " 'ordinarily under no duty . . . until he knows or has
reason to know" that the acts of third persons may harm his
invitees, may "know or have reason to know, *from past expe-
rience.*' " *Id.* (emphasis added) (quoting § 344 cmt. f). Thus,
"[i]f the place or character of his business, or his *past experi-
ence*, is such that he should reasonably anticipate . . . criminal
conduct on the part of third persons, . . . he may be under a
duty to take precautions against it, and to provide a reason-
ably sufficient number of servants to afford a reasonable pro-
tection." *Id.* (emphasis altered in part) (quoting § 344 cmt. f).

The Washington Supreme Court then concluded:

> [B]ecause of the special relationship that exists
> between a business and business invitee, we hold a
> business owes a duty to its invitees to protect them
> from imminent criminal harm and reasonably fore-

seeable criminal conduct by third persons. The business owner must take reasonable steps to prevent such harm in order to satisfy the duty.

*Id.* at 292-93.

Additional clues to the foreseeability inquiry comes from *Christen v. Lee*, 780 P.2d 1307 (Wash. 1989). In *Christen*, the Washington Supreme Court explained that criminal conduct of third persons "bears on whether the act was foreseeable, but it does not necessarily preclude a finding of foreseeability." *Id.* at 1313. The court continued: "an intervening [criminal] act is not foreseeable if it is '*so highly extraordinary or improbable as to be wholly beyond the range of expectability.*'" *Id.* (emphasis added) (quoting *McLeod v. Grant Cnty. Sch. Dist. No. 128*, 255 P.2d 360, 364 (Wash. 1953)). The court also noted that it is not the "'unusualness of the act that resulted in injury to [the] plaintiff that is the test of foreseeability, but whether the result of the act is within the ambit of the hazards covered by the duty imposed upon [the] defendant.'" *Id.* (emphasis omitted) (quoting *Rikstad v. Holmberg*, 456 P.2d 355, 358 (Wash. 1969)). In other words, "[t]he manner in which the risk culminates in harm may be unusual, improbable and highly unexpectable, from the point of view of the actor at the time of his conduct. And yet, if the harm suffered falls within the general danger area, there may be liability . . . ." *Rikstad*, 456 P.2d at 358 (citation omitted).

Since *Nivens*, the Washington intermediate appellate courts have further refined the foreseeability inquiry in a way that seems to narrow the duty owed, and perhaps substantially so. *See Fuentes*, 82 P.3d 1175; *Craig*, 976 P.2d 126; *Raider*, 975 P.2d 518; *Wilbert*, 950 P.2d 522. *Wilbert* is representative of that quartet. In that case, a wedding party and organizers of a private dance event rented out adjacent space in a community center hall, operated by the Metropolitan Park District ("Metro"). *Wilbert*, 950 P.2d at 523. During the dance, Derrick Wilbert, a business invitee, was shot and killed. *Id.* at

523-24. Wilbert's family sued Metro, alleging negligence based on premises liability. *Id.* at 524. The court of appeals affirmed a grant of summary judgment for Metro, holding that the shooting was not foreseeable as a matter of law because evidence of "a number of unruly, aggressive, vulgar young people at the dance" and fights earlier in the night were insufficient to show that Metro "should reasonably have anticipated a more serious misdeed." *Id.* at 525. Therefore, the shooting was unforeseeable and "Metro owed Wilbert no duty of prevention." *Id.*

In reaching its decision, the court of appeals noted the principles of foreseeability established by the Washington Supreme Court in *Nivens* and other cases and gleaned from these that foreseeability of criminal conduct has "prerequisites." *Id.* These "prerequisites" are "specific evidence that the defendant knew of the dangerous propensities of the individual assailant or previous acts of similar violence on the premises." *Id.*

From this and the three other similar appellate cases, the district court in this case stated the test this way: "there is an issue for the jury as to whether the third party's criminal conduct is reasonably foreseeable *only if* plaintiff presents competent evidence that similar criminal conduct has occurred on the premises in the past." (Emphasis added). Applying that test, it granted summary judgment to the defendants, because it found that McKown's examples were not similar enough to the act of violence that occurred here. Therefore, the court concluded, McKown had not met his burden to show some evidence of similar criminal conduct on the premises, and the case would not be allowed to go to the jury.

## B.

We are unsure whether that is the proper test under Washington law, and, if it is, how it must be applied. On the one hand, the two Washington Supreme Court cases do not create

a "similar acts on the premises test" in so many words. They may allow for a broader notion of foreseeability that would allow for McKown to take this case to a jury. On the other hand, the intermediate appellate courts have repeatedly applied just such a test, holding that it is a natural consequence of *Nivens* and other Washington Supreme Court cases. Indeed, this tension is perfectly illustrated by the district court's initial denial of Simon's motion for summary judgment, followed by its reversal and subsequent grant of summary judgment in light of its taking a closer look at the intermediate appellate cases. Moreover, if the "similar acts" test does apply, there is a subsidiary question of how "similar" the intervening acts must be to the act giving rise to the tort to trigger the duty. Our task, when sitting in diversity, is to ask ourselves what the Washington Supreme Court would do with this case, using the intermediate appellate decisions as guidance. Simply put, we just do not know what it would do. Hence, this certification order.

We are especially reluctant to answer this question ourselves because these questions raise important policy considerations that only Washington state can answer. After all, imposing a broader duty on a mall owner to implement security to protect against unannounced shooters could help protect the public. But it could also add expense for owners and might impact willingness of out of state property groups to buy a mall in Washington, because of expenses of monitoring or some other security guard protection. A more extensive requirement of surveillance or monitoring may also pose concerns related to the personal privacy of patrons at the mall. Especially in light of this particular case's importance to the citizens of Washington state, we think these questions should be addressed by the state Supreme Court, rather than by a federal court sitting in diversity.

## IV.

In light of our foregoing discussion, we respectfully certify to the Washington Supreme Court the questions stated at the

outset of this order. We do not intend, by the phrasing of our questions, to restrict the Washington Supreme Court's consideration of this issue. We recognize that the Washington Supreme Court may, in its discretion, reformulate the question. *Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999).

If the Washington Supreme Court accepts review of the certified questions, we designate McKown to file the first brief pursuant to Wash. R. App. P. 16.16(e)(1).

The Clerk of Court is hereby ordered to transmit forthwith to the Washington Supreme Court, under official seal of the United States Court of Appeals for the Ninth Circuit, a copy of this order and all briefs and excerpts of record pursuant to Wash. Rev. Code §§ 2.60.010(4), 2.60.030(2), and Wash. R. App. P. 16.16.

Further proceedings in this court are stayed pending the Washington Supreme Court's decision whether it will accept review and, if so, receipt of the answer to the certified question. The case is withdrawn from submission until further order from this court.

The panel will resume control and jurisdiction upon receipt of an answer to the certified question or upon the Washington Supreme Court's decision to decline to answer the certified question. When the Washington Supreme Court decides whether or not to accept the certified question, the parties shall file a joint status report informing this court of the decision. If the Washington Supreme Court accepts the certified question, the parties shall file a joint status report informing this court when the Washington Supreme Court issues its answer.

**SO ORDERED.**