

RECEIVED
APR 27 2016
DYNAN &
ASSOCIATES



# TRIDENT
INVESTIGATIVE SERVICE, INC.

CORPORATE SPECIAL SERVICES

CONTRABAND DETECTION
CANINE SERVICES

---

# EXPERT REPORT

---

### In the matter of:

McKown v Simon Property, IPC International Corporation
United States District Court
Western District of Washington
No. C08-575-BHS


### Submitted to:

Mr. Mark J. Dynan
Mr. Matthew T. Wood
Attorneys at Law
Dynan & Associates, P.S.
2102 North Pearl Street
Building D, Suite 400
Tacoma, WA  98406-2550

### Prepared by:

Mr. Michael J. Canaan, CPP CFLC
P.O. Box 5909
Kent, WA  98064

# EXPERT REPORT

## *TABLE OF CONTENTS*

| | | |
|---|---|---|
| 1 | *INTRODUCTION AND ASSIGNMENT* | **4** |
| 2 | *COMPLAINT* | **5** |
| 3 | *INCIDENT LOCATION* | **5** |
| 4 | *CASE PARTICIPANTS* | **6** |
| 5 | *INTERVIEWS* | **7** |
| 6 | *SITE VISIT* | **8** |
| 7 | *DISCUSSION* | **8** |
| 8 | *INCIDENT SUMMARY* | **9** |
| 9 | *FINDINGS AND OPINIONS* | **12** |
| 10 | **CONCLUSIONS** | **54** |
| 11 | *APPENDIX 1 — BOARD CERTIFICATIONS* | **57** |
| 12 | *APPENDIX 2 — CURRICULUM VITAE* | **57** |
| 13 | *APPENDIX 3 — EXPERT WITNESS CASES* | **57** |
| 14 | *APPENDIX 4 — MATERIALS AND EXHIBITS REVIEWED* | **57** |
| 15 | *APPENDIX 5 — PHOTOGRAPHIC INDEX* | **57** |
| 16 | *APPENDIX 6 — GLOSSARY OF INDUSTRY TERMS AND DEFINITIONS* | **63** |

Tuesday, April 25, 2016

Mr. Mark J. Dynan
Mr. Matthew T. Wood
Attorneys at Law
Dynan & Associates, P.S.
2102 North Pearl Street
Building D, Suite 400
Tacoma, WA 98406-2550

RE: **SECURITY EXPERT REPORT**, *McKown v Simon Property, IPC International Corporation*

Dear Mr. Dynan and Mr. Wood:

## Introduction and Assignment

My name is Michael J. Canaan, CPP CFLC. I am Board Certified in Security Management by the *American Society for Industrial Security, International*, as well as, a Certified Forensic Litigation Consultant by the *Forensic Expert Witness Association* as explained in *Appendix 1* below.

I have consulted, provided security consulting or assessment and investigative services across North America to include Alaska, and Canada, as well as, several Central and South American Countries. Details of my more than 38 years of professional security, investigative, military, and law enforcement qualifications and experience entitle me to give expert opinion evidence are noted in my Curriculum Vitae in *Appendix 2* below.

My background and experience have allowed me to become familiar with professional security industry standard of care regarding security officer hiring, deployment, supervision, policy and procedures, and training; and emergency management and planning.

My background and experience have allowed me to become familiar and experienced in assessing and specifying security programs hardware, technology, infrastructure; and crime prevention design.

1    On January 20, 2016, you contacted me to opine as to a shooting incident which occurred at the
2    Tacoma (Washington) Mall on Sunday, November 20, 2005.  More specifically, you asked me to
3    review the overall standard of care regarding IPC International Corporation Tacoma Mall security
4    practices, policies and procedures in place at the time of the incident.
5
6    My compensation for this case is based upon a rate of $225/Hour plus expenses billed at actual
7    cost.  As of the completion of this report, I have not prepared a final billing for my services.
8
9    The following report supports my professional opinion.
10
11

## Complaint

12
13   On November 12, 2008, Brendan McKown filed a complaint against Simon Property Group and
14   IPC in Pierce County Superior Court in the State of Washington.  The case was later moved to
15   Federal District Court in Tacoma.  In his complaint, McKown alleged five state law causes of
16   action against defendants: (1) failure to protect tenants and business invitees from foreseeable
17   criminal conduct; (2) negligent rendering of security measures and services; (3) negligent
18   performance of undertaken duty; (4) negligent hiring and/or failure to employ security personnel;
19   and (5) breach of express and/or implied contract.
20
21

## Incident Location

22
23   In 2005, the Tacoma, WA Mall was (approximately) a 1.3 million-square-foot, 150 store, regional
24   shopping center located within a mixed commercial-residential area south of downtown Tacoma
25   bordered to the east by Interstate 5 and just south of State Route 16.
26
27
28
29
30
31
32

## Case Participants

1

2  Over the course of my investigation and from documents reviewed, I have learned of the following
3  individuals and their involvement in the incident:

4

| Name | Involvement |
|------|-------------|
| Dominick Maldonado | Suspect |
| Roberta Davis | Shooting Victim 1 |
| Frank Stiles | Shooting Victim 2 |
| Frank Latimer | Shooting Victim 3 |
| Andrea Hutchison | Shooting Victim 4 |
| Carol Wasser | Shooting Victim 5 |
| Amit Ben Yehuda | Shooting Victim 6 |
| Ruth Jackson | Shooting Victim 7 |
| Brendan McKown | Shooting Victim 8 |
| David D. Schneider | McKown's Excalibur co-worker |
| Crystal Tyler | Kit's Camera Employee |
| Javier (Jay) Fortier | Kit's Camera Employee |
| Katherine Riggans | Hostage 1, Sam Goody Manager |
| Joseph Hudson | Hostage 2, Sam Goody Employee, former Army Medic |
| Jon Black | Hostage 3, Sam Goody Customer, military member |
| P.P. | Hostage 4, 9-year-old boy |
| Travis L. Grobe | Witness, employee at Zumiez |
| Christopher Winters | Witness, shopper |
| Timothy Phillipson | Witness, shopper |
| Robert Morley | Witness, shopper |
| Braxton Traylor | Witness, employee at Van's |
| Janessa Taylor | Witness, shopper |
| Moses Martinez | Witness, provided medical aid to McKown |
| David Donaway | Simon Properties Vice President of Security |

| Steve Heim | Simon Tacoma Mall Manager |
|---|---|
| Donald Lantz | IPC Senior Executive Vice President |
| Kirk Barnett | IPC Tacoma Mall Regional Director of Security |
| Rick Erdie | IPC Tacoma Mall Director of Public Safety and Security |
| Tim Neher | IPC Tacoma Mall Assistant Security Director |
| George Aguillon | On-duty IPC Tacoma Mall Security Lieutenant / Administrative Officer |
| Chantel N. Bursott | On-duty IPC Tacoma Mall Security Sergeant |
| Danny Kim | On-duty IPC Tacoma Mall Corporal, shift supervisor |
| Theresa Tacconelli | On-duty IPC Tacoma Mall Security Officer |

1
2

## Interviews

3
4     I conducted, or attempted interviews of the following persons:
5

| Date of Interview | Name | Other Information |
|---|---|---|
| 03/16/16 | Rick Erdie | IPC Director of Security and Safety. |
| UTC | Danny Kim | IPC Shift Supervisor |
| 04/20/16 | Javier (Jay) F. Fortier | Kit's Camera Employee |
| UTC | Robert Fortier | Brother of Jay Fortier who was in Kit's Camera at the time of the shooting |
| UTC | Crystal Tyler | Kit's Camera Employee |
| 04/14/16 | Timothy Phillipson | Witness/Customer |
| UTC | Moses Martinez | Witness/Customer |
| UTC | Tim Neher | IPC Assistant Security Director |
| 04/22/16 | Bill Strother, CPP | Director of Corporate Security, Weingarten Realty Investors |
| 04/22/16 | Joseph Marcello, CPP | Senior Vice President, Universal Protection Services (Former Sr. Vice President of National Operations, IPC) |
| 04/22/16 | Malachy Kavanaugh | Senior Staff Vice President, Programs and Services, International Council of Shopping Centers |
| 03/17/16 | Henry Gill | Interviewed at the Tacoma Mall. Retired Tacoma Police Officer who responded to incident |

6
7     UTC = Unable to Contact

## Site Visit

On Thursday, March 17, 2016, I met with Attorney Matt Wood and former, now retired, Police Officer Henry Gill for an escorted site visit of the Tacoma Mall by Mall Manager, Mr. Stacey Monroe.  We walked in the general vicinity of the shooting comparing police crime scene photographs and diagrams with the current tenant spaces and kiosks.

Mr. Gill provided his perspective of the scene as an early-arriving, eye-witness first-responder to the incident.

I obtained several photographs of the general area.  It appears that what was the Sam Goody store is now a Van's shoe store and Kit's Camera is now a Gymboree children's clothing store. Photographs taken are included on an enclosed CD-ROM.

Distance measurements were taken with a Leica model DISTO E7400x laser distance measuring device.  Those measurements are described in the report below.

## Discussion

The forensic methodology for the analysis utilized in this case is consistent with accepted best practices within the security industry, as well as my knowledge and experience as a security expert and consultant.

This analysis was performed by reviewing a variety of areas to include, but not limited to, documents, exhibits, evidence, interviews, statements, reports, and reference materials made available to me and by applying my education, training and experience to the facts of this case.

This report and expert opinion is based, in part, on my education, training and experience in the security and investigative fields.  In addition, I have reviewed, consulted, and relied upon certain materials or exhibits, prepared or furnished by other individuals and sources, as noted in *Appendix 4* below.

1   Any professional industry reference materials, publications, standards, handbooks, groups, and
2   guidelines used to form my expert opinion herein are referenced in *Appendix 5* below.
3
4   Industry, legal, or technical terms included in this report are defined in *Appendix 6* below.
5
6

## Incident Summary

7
8   The following table denotes related events and the chronology of the incident itself as learned
9   from police reports, interviews, statements, documents, exhibits, and reference materials
10  provided to me.   All times are approximate.
11

| Time | Activity |
|------|----------|
| 10:30 AM | McKown opened the Tacoma Mall Excalibur Cutlery and Gift Shop |
| 11:12 AM | Maldonado sent a text message to an ex-girlfriend, "Today is the day the world will know my anger.  Today the world will feel my pain.  Today is the day I will be heard". |
| 11:30 AM | Maldonado entered the mall at the narrow corridor on the north side of the mall between Lens Crafters and Sears carrying a nylon, soft-side guitar case slung over his shoulder.  He was well-groomed, clean, wearing a white dress shirt, gray tie, black pants, black dress belt, black dress shoes, and long coat. (Witness Winters) |
| | Maldonado walked south in this hallway until he reached the main east/west concourse and then turned and walked westbound. |
| | Maldonado walked to the intersection leading to the food court area and turned south, and continued walking to the food court. |
| | Maldonado entered the public restroom in the northwest corner of the food court where he remained for a short period of time.  There he "made noise" in order to get attention. |
| | When no one paid attention to him, Maldonado exited the restroom retraced his route back to the area of the main concourse, and east toward J.C. Penney. |
| 12 Noon | McKown exited the Excalibur Cutlery store and walked to the Kit's Camera store. |
| | Maldonado entered the Lens Crafters hallway, placed his nylon guitar case on the floor, opened the case, and inserted a fully loaded magazine into both his rifle and pistol which remained concealed under his long coat. |
| 12:09 PM | Maldonado called 911 reporting that he was going to start shooting.  The location was not determined by dispatchers. |
| | Maldonado exited the hallway, walked a short distance to the T-Mobile kiosk and had a brief conversation with employee, Daniel Torres. |
| 12:10 PM | Maldonado stepped away from the T-Mobile kiosk, removed his coat and began firing his rifle.  The sounds of gunfire were not heard in the security office. |
| | The security office received a radio call from a housekeeper that there was a shooting in the mall. |

| | |
|---|---|
| | An unidentified customer came to the front door of the mall security office with notification of the shooting. |
| 12:10 PM | Lt. Aguillon (W40) called police dispatch on the Tacoma Police radio advising them of the shooting. |
| 12:10 PM | Sgt. Bursott and Corporal Kim exited the security office. |
| 12:10 PM | Security Officer Tacconelli responded from the Food Court where she met Corporal Kim. |
| 12:10 PM | Tacoma police are dispatched to the mall. |
| | McKown stepped out of the Kit's Camera store and confronted Maldonado on the main concourse. |
| | Maldonado fired his rifle at McKown who then fell to the floor of the mall, wounded.  Maldonado kept walking westbound on the concourse. |
| | Maldonado entered the Sam Goody music store where he fired several more rounds in the store, damaging displays and merchandise to include musical instruments.  He then took four people hostage. |
| | Witness Phillipson dragged McKown into the Kit's camera store. |
| 12:13 PM | Tacoma Police began arriving at the mall, setting up perimeter and a command post. |
| | Witness Martinez provided medical aid to McKown. |
| 12:29PM | Tacoma Police establish contact with Maldonado via telephone. |
| | McKown was removed by Tacoma Police through the back entrance of the Kit's Camera store. |
| 1:41 PM | Hostage, **PP** was released to police. |
| 3:36 PM | Maldonado offered to surrender. |
| 3:46 PM | Remaining hostages released.   Maldonado surrendered to police shortly thereafter. |
| 4:01 PM | Maldonado was taken by police from the mall. |

Empty time field entries above could not be determined from documents provided, however I was able to construct the following information from witness statements and depositions:

- The shooting spree lasted approximately:
    - Witness Hudson 15-20 seconds;
    - Witness Torres +/-1 minute;
    - Maldonado's statement to police: "It happened so quick, cocking it (rifle)…and then going to Sam Goody";
    - When asked how many shots he fired in the mall, Maldonado said, "26 or 25". "One fully loaded magazine with 30 rounds in it". He removed it from the rifle in the (Sam Goody) store and "saw that there were 5 rounds still in it".

- o Witness Davis reported to police that she heard two "groups" of 10 shots in rapid succession, 10 seconds apart;
- o Witness Traylor, in his statement to police, reported hearing the first string of 9-13 shots fired, then a 30 second pause followed by a second string of 9 rounds fired;
- o Witness Martinez reported to police that two shots were initially fired, a brief pause then 5-7 rounds were fired, then followed within seconds of continued firing for a total of 45 seconds to a minute before he "ran it dry" (empty magazine);
- o Witness Fortier said in his statement to police, the shooting lasted "...at most, 45 seconds";
- o Witness Minichiello reported to police that "...it's probably 30-40 seconds" from the first shot until he moved to others (to render aid) nearby;
- o McKown in his deposition was asked, "How many shots?" He answered, "Three shots followed by a couple more shots with a smaller -- well, three shots for sure is when I drew my gun. Three shots and a second or two, you know, a brief moment to process that's real gunfire. It's not pellets falling. It's gunfire. I know it for a fact". (McKown Deposition, Page 163:18 to 163:23);
- o McKown was asked when in relation to the first time he saw Mr. Maldonado does the shooting stop? (McKown reported that he was standing concealed and behind cover in the Kit's Camera store.) He answered, "Shooting stops long before I see Maldonado. There's this -- I've decided to just rush out there and then the shooting stops. And in that situation it seemed -- I don't know if it was five seconds or solid minutes, but it just seemed forever". (McKown Deposition, Page 175:4 to 175:10).

- According to the Tacoma police report evidence logs, a total of 17 spent rifle casings were found. Fifteen were found in the main concourse between the T-Mobile kiosk and Kit's Camera; two were recovered from inside of the Sam Goody store. Four spent 9mm pistol casings were also found in the Sam Goody store.

- According to varying witness accounts, the rifle rounds were fired in 2-4 short bursts.

- From measurements taken during my site visit, I determined the approximate distance from the south entrance of the Lens Crafters hallway to the north side of the T-Mobile kiosk is 28 feet.

- The approximate distance from the center of the north side of the T-Mobile kiosk to the southeast corner entrance of the Kit's Camera store is 85 feet, or 34 steps, taking 20 seconds (average of three adult males) to walk that distance at a normal pace.

- Witness Grobe in a statement to police that Maldonado was "walking, aiming, and shooting";

- Witness Morley in a statement to police that Maldonado "casually walked westbound...";

1      • McKown in a statement to police said, "He then saw a kid walking north past Kit's Cameras
2        who was about 5 feet away";
3      • Witness Jackson in a statement to police said, "He was kind of moving slow, down the
4        hallway (concourse)."
5

6

## Findings and Opinions

7

8 It is generally accepted by security professionals and law enforcement officials that on premises
9 open to the public, criminal activity cannot always be prevented or deterred.  Further, it is
10 recognized that no security plans or solution is perfect, especially those that are passive, require
11 human interface, manual activation, or response.

12

13 The standard of care for business operators does not require perfect crime prevention or a
14 guarantee of safety. Only that the standard of care put forth requires a reasonable and prudent
15 security plan, based on foreseeable crime, to discharge their duty of care.

16

17 From the information available to me now and based upon my review of the materials referenced;
18 incorporating my experience and training as a security professional; understanding of the security
19 industry's professional standard of care, custom and best practice, I have reached the following
20 conclusions and opinions.

21

22

## 23 FINDING: STANDARD OF CARE AND BEST PRACTICES

24 The minimum standard of care in many premises liability cases will usually be in compliance with
25 law or local regulations. These published minimum standards of care are found in a variety of
26 sources to include, but not limited to statutes, codes, ordinances, licenses, and permits legally
27 enacted by a state, city, county or federal government.

28

29 A second standard of care reference can be company policy. For example, an employer may
30 have a strict policy not to use physical force to detain persons because their employees are not
31 trained or equipped to do so.  Problems could arise due to excessive use of force or improperly
32 applying restraints.  Any injury incurred could result in a claim of negligence, a breach of the
33 company's own published standard of care.

34

1   A third source of standard of care reference can be professional guidelines and standards.
2   However, great care must be exercised when considering or implementing these professional
3   standards. A "cookie cutter" template guideline or standard, no matter how detailed, might not fit
4   all scenarios. For example, no two shopping malls are identical. These malls may have similar
5   characteristics such as tenant demographics, however significant differences could exist in
6   physical site location, facility construction, parking, neighborhood and crime demographics,
7   population density, weather, economic climate, etc. Therefore, security infrastructure, staffing,
8   equipment, training, and supervision requirements could be quite disparate between sites.
9
10  With that said, business owners should take into account recommended guidelines, policy, and
11  best practices unique to the nature of their operation. Those industry-specific standards,
12  guidelines and practices can be used with professional oversight, all or in part, with great success,
13  as it fits the specific needs of the organization.
14
15  If, at a later time, it is determined that industry standards or guidelines, along with business
16  policies and procedures do not resolve security or safety concerns, consideration should be given
17  to other methods or preventative measures to alleviate those issues.
18
19  With the passing of over a decade, there were numerous challenges in determining standard of
20  care in 2005. Needless to say, crime prevention methodology has changed to some extent since
21  then. In regard to security technology alone, we have experienced advancements several-fold.
22  Further, we have fluctuating economic and social conditions; varied criminal methodology; and
23  an increased focus on terrorism prevention techniques and technology.
24
25  Today, mall operators offer emergency evacuation training sessions for staff members and
26  tenants; increased security staffing accommodating evolving threats; installing shatterproof
27  windows, bomb-resistant trash cans; and integration of expanded IP-based security video
28  systems both indoors and outdoors.
29
30  It is not uncommon for mall management to invite local emergency responders to speak to their
31  staff and to use the mall facilities after hours for practice drills and scenarios.
32
33  Today, many malls are turning to the very shoppers they hope to protect, encouraging them to
34  report suspicious activity through social media. For the most part, we did not see these current
35  trends in 2005, which truly was a different time.
36

THIRD PARTY GUIDELINES OR STANDARDS FOR SHOPPING CENTERS AND MALLS

In my research efforts, I did not find any relevant shopping mall security guidelines or standards in place at the time of the November 2005 incident.  However, what I did find in my research shows that the year 2005 was right on the cusp of future publications in this arena.

I looked at the following leading organizations for published security guidelines or standards reference:

- The *American Society for Industrial Security, International* (ASIS) is the preeminent professional security practitioner organization in the world with over 35,000 members.
- The *National Fire Protection Association* (NFPA), was founded in 1896.  The NFPA is a global, nonprofit organization with over 60,000 members devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards.  The association delivers information and knowledge through more than 300 consensus codes and standards, research, training, education, outreach and advocacy; and by partnering with others who share an interest in furthering the NFPA mission.
- The *National Retail Federation* (NRF) is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants and Internet retailers from the United States and more than 45 countries.
- Founded in 1957, the *International Council of Shopping Centers* (ICSC) is the global trade association of the shopping center industry. Its more than 70,000 members in over 100 countries include shopping center owners, developers, managers, investors, retailers, brokers, academics, security professionals, and public officials.

The table below shows a chronological list of security industry guidelines and standards.  Those published during or after 2005 are not necessarily germane to this case.

| General Security Risk Assessment | ASIS | 2003 |
|---|---|---|
| Guide to Writing a Shopping Center Security Manual | ICSC | 2003 |
| Disaster/Emergency Management and Business Continuity/Continuity of Operations Programs, NFPA 1600 | NFPA | 2004 |
| Business Continuity Guideline: A Practical Approach for Emergency Preparedness, Crisis Management, and Disaster Recovery | ASIS | 2005 |
| Workplace Violence Prevention and Response Guide | ASIS | 2005 |
| Risk Assessment Guideline. Elements for Violence.  Considerations for Assessing the Risk of Future Violent Behavior | ATAP | 2006 |
| Guide for Premises Security, NFPA 730 | NFPA | 2006 |
| Information Asset Protection | ASIS | 2007 |

| | | |
|---|---|---|
| Emergency Response Protocols to Active Shooters – Retail Supplement to DHS Active Shooter Materials | NRF / ICSC | 2008 |
| Facilities Physical Security Measures | ASIS | 2009 |
| Organizational Resilience: Security, Preparedness, and Continuity Management Systems-Requirements with Guidance for Use | ASIS | 2009 |
| Pre-employment Background Screening Guideline | ASIS | 2009 |
| Business Continuity Management Systems - Requirements with Guidance for Use | ASIS | 2010 |
| Private Security Officer Selection and Training Guideline | ASIS | 2010 |
| Workplace Violence Prevention and Intervention. American National Standard | ASIS SHRM | 2011 |
| Conformity Assessment and Auditing Management Systems for Quality of Private Security Company Operations | ASIS | 2012 |
| Management System for Quality of Private Security Company Operations—Requirements with Guidance | ASIS | 2012 |
| Security Management Standard: Physical Asset Protection | ASIS | 2012 |
| Chief Security Officer—An Organizational Model | ASIS | 2013 |
| Crime Prevention through Environmental Design, Protection of Assets Manual | ASIS | 2013 |
| Maturity Model for the Phased Implementation of a Quality Assurance Management System for Private Security Service Providers | ASIS | 2013 |
| A Study of Active Shooter Incidents in the United States Between 2000 and 2013 | USDOJ / FBI | 2013 |
| Investigations | ASIS | 2015 |
| Disaster/Emergency Management and Business Continuity/Continuity of Operations Programs, NFPA 1600 | NFPA | 2016 |

To comment briefly on those three 2005 or older references, the *NFPA 1600 Disaster/Emergency Management and Business Continuity/Continuity of Operations Programs,* is written for a corporate environment where control of all persons in the environment are under a single management structure. Not the diverse, multi-tenant shopping mall where tenants, for the most part, have their own individual or proprietary corporate plans.

*The ASIS Business Continuity Guideline* encompasses a loosely defined set of planning, preparatory and related activities which are intended to ensure that an organization's critical business functions will either continue to operate despite serious incidents or disasters that might otherwise have interrupted them, or will be recovered to an operational state within a reasonably short period. Again, not necessarily suited for a shopping mall environment.

And last, the *ASIS Workplace Violence Prevention and Response Guide* was written more for the corporate workplace, again with controls of all persons under a single entity; not a diverse environment public shopping mall.

1   All other documents which could be used to develop best practices were published after 2005
2   and therefore, should not necessarily be used to critique what was, or was not in place at IPC
3   Tacoma Mall in 2005.

5   In his deposition, Plaintiff's expert Wuorenma was asked, "There isn't a text, a treatise, a book, a
6   published standard, a law, an administrative regulation; there's no external source -- external to
7   your mind, that is – upon which you rely in these opinions that Simon and/or IPC failed to do the
8   things you've listed here; is that correct?"  Wuorenma answered, "That's correct". (Wuorenma
9   Deposition, Page 137:13 to 137:18)

11   Industry experts and interview subjects Marcello, Strother and Kavanagh all agreed that "cookie
12   cutter" national shopping center or mall security guidelines or standards could not possibly fit all
13   environments.  To the person, they believe that any one national standard would not be an
14   effective operational tool. They further opined that as it was in 2005, it today remains best practice
15   for professional mall and security company executives to work in collaboration with peer security
16   and risk experts, and local law enforcement officials to establish policies and procedures which
17   are best for their own properties and diverse locations.

19   Mr. Malachy Kavanaugh, Senior Staff Vice President, Programs and Services, International
20   Council of Shopping Centers, said in his interview that they never have had, and likely never will
21   have a national security standard for their industry.

23   **GENERAL CRIME PREVENTION STRATEGIES FOR SHOPPING CENTERS AND MALLS**
24   The term "shopping mall" is used to describe a cluster of shops or stores designed and developed
25   as one architectural unit. Shopping malls may be small, large, covered, uncovered, one or many
26   storied, with exposed or undercover parking.

28   Shopping malls now seen around the world evolved out of "Main Street USA" shopping areas.
29   The first recognizable shopping mall was built in 1907. With the World War II baby boom, shopping
30   centers, and subsequently malls, were integrated into growing communities.

32   Continued growth and the proliferation of motor vehicles saw the emergence of larger malls
33   serving mobile regional populations. Most recently, huge regional malls housing office complexes
34   and cinemas, as well as, department stores, restaurants, specialty shops and individual boutiques
35   have appeared.

A good security plan will foresee opportunities for crime and detect, deter or deny them by using a combination of proactive and preventive solutions. The best way to remove ability or opportunity from the criminal is to restrict access to the site.

Barriers or checkpoints, as we see in what is referred to as the "Israeli Model" shopping center were not, and are not even today considered feasible or reasonable. A mall operator could place armed guards at every entrance and exit in its complex. However, our society has not reached that level of acceptance.

My background, training and experience in shopping mall and retail environments has shown me that overt security presence is one of the most effective deterrents to crime. For security officers to see, and be seen shows professional or opportunistic criminals that mall management and tenants have a proprietary interest in maintaining order.

Mall security officers should also be reasonably trained, equipped, and readily available for a rapid, and timely response to medical emergencies or other exigent needs that customers or tenant employees may experience.

Malls also tend to be magnets for youth looking for social activities or entertainment. From a security perspective, deterring disorderly youth behavior can be problematic. Again, security officer visibility, watching for or detecting problems before they occur, moving loiterers along, and preventing large groups from massing, is best practice in managing the younger generations.

In the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack* found:

- 37% of the mall security director respondents said that they had developed a set of goals and objectives with respect to protection from a terrorist attack;
- 25% said that they had specific performance measures to define whether they were meeting those goals;
- 34% occasionally used undercover staff as part of their surveillance strategy;
- 49% of the respondents said that their staff were instructed to be on the lookout for unusual behavior or dress of mall clients;
- 33.7% said the policy on handling suspicious behavior or persons was to report the behavior to a supervisor;
  - 30.3 percent said it was to continue surveillance

- o  18 percent said it was to inform police
- 11.2% said it was acceptable to approach a suspicious person if they considered the incident non-threatening.
- Half of the security directors said that their mall had a security video system;
  - o  81% of those systems were used to monitor events in real time

Today, as in 2005, there are any number of effective crime prevention strategies that can serve to help keep retailers, shopping centers and malls be safer and more secure. Such strategies include, but are not limited to, the following:

- Uniformed and Plain Clothes Security Patrol
- Security Escorts
- Law Enforcement Storefront/Community Policing Substation
- Standardized, effective Exterior Lighting
- Placement of Public Restrooms
- Secured Non-Public Areas
- Marked Security Vehicles
- Mobility Devices such as bicycles, T3s or Segways
- Public Security and Information Booth
- Rooftop Patrol
- Shoplifting Awareness Training
- Security Awareness Programs
- Crime Prevention Programs
- Exercise Walkers
- Emergency Phones or Call Boxes
- Volunteer Patrol
- Notification and Information Signs
- Emergency Management Plan
- Behavior Profiling
- Use of Security Video and Publicly Viewable Security Camera Monitors
- Monitoring Fire/Life Safety Systems
- Greeters
- Staffed Security or Information Booths
- Electronic Security Guard Tour System

On November 5, 2005, IPC Tacoma Mall Security Director, Rick Erdie submitted a two-page synopsis memo to Steve Heim and Kirk Barnett outlining efforts taken since 2002 to improve security at the Tacoma Mall. In summary, he addressed items to include raising security officer pay, upgraded Fire Management System (FMS), additional guard hours in the food court, and an improved relationship with the Tacoma Police Department.

The memo further outlined initiatives for a CCTV system, purchase of an additional Segway, improved parking lot lighting, hiring of off-duty police officers on Friday and Saturday nights, and wage flexibility were all slated to occur moving forward.

IPC Tacoma Mall Security Sergeant Bursott was asked, "Would you say the presence of security tended to deter crime?" She answered, "Yeah". (Bursott Deposition, Page 72:16 to 72:18)

IPC Tacoma Mall Security Officer Tacconelli was asked, "Were there any special security policies for the holiday season?" She answered, "There was one policy where we were advised not to let groups no bigger than, I think, three, five—depending on who they were, if they were wearing colors, that kind of thing, they had to split up, couldn't be all in the same group. They couldn't congregate for long periods of time in certain areas. The follow-up question asked, "Was this specific to the holidays? She answered, "It was mostly-- that was where we noticed it the most was during the holidays. It was just easier for that kind of thing to happen." (Tacconelli Deposition, Pages 37:23 to 38:10)

Simon Properties Vice President of Security Donaway said, "We expect our security officers to be seen, we expect them (security officers) to provide a safe and friendly environment for our shoppers and for our tenants and employees, and we expect them to be observant and be diligent in their patrol duties, whatever those may be, and that's, again, dictated by the security provider because that's what they do, and we expect them to liaison with law enforcement, we expect them to write reports for incidents that do happen so they can be analyzed and so we can make necessary adjustments to address any trends or issues, and any other duties."

In the next paragraph, Donaway said, "Basically I guess the primary thing we want them doing is being in uniform and moving around the property, interacting with the tenants and with the guests, and patrolling the parking lots, patrolling the interior, and being seen, being vigilant, visible, very visible". (Donaway Deposition, Volume 1, pages 66 line 25, page 67 lines 1-15)

As to the subject of security officer awareness, the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack* found the kind of suspicious behavior security staff were instructed to look for generally included furtive actions, taking photos or notes of the facilities, suspicious clothing (extra bulky), or large or unusual packages. However, mall managers did not want security personnel harassing or intimidating guests and potentially alienating customers.

When Maldonado entered the mall, he was wearing a long, black, formal or business-style overcoat. *See* evidence photographs.

Witness Riggans stated that he (Maldonado) was wearing a lighter-purple dress shirt, a dark tie and dark slacks. (Riggins Deposition, Page 20:3 to 20:4)

Witness Torres wrote, "Mr. Maldonado was dressed nicely. He looked like he had come from church. Indeed, he looked very similar to many of the other customers shopping at the Tacoma Mall that day." (Torres Declaration page 2, lines 5-8).

We know after-the-fact that Maldonado's appearance did not cause enough concern for anyone to bring it to the attention of security or a mall representative. Maldonado reported that he dressed in such a manner as to not draw attention to himself. When asked why he dressed as he did, Maldonado elaborated in his statement to police, "I thought I was going to talk to news people". Asked how he thought he would talk to the media, he said, "By taking hostages". (Tacoma Police Report .pdf page 260)

It has been expressed in court proceedings that Maldonado was carrying a guitar case which was suspicious since there was no music store in the area. To the contrary, we know that after Maldonado entered the Sam Goody store, employee Joseph Hudson in his interview with the Tacoma Police Department stated, that Maldonado "...fired several rounds into product, such as guitars, into the ceiling, light bulbs and at a fake video camera". We also see in police evidence photographs of the Sam Goody store numerous damaged guitars. Keyboards and guitars are also seen displayed, undamaged on store shelving.

The 2006 Department of Justice study showed the standard practice was for guards to be reactionary in nature, to provide a visual reminder that they are there, and report unusual behavior to superiors or directly to police. This was the policy and procedure of IPC which I will elaborate in a following section.

In 2005, IPC Tacoma Mall Security operated a single Segway mobility vehicle.  The Segway is shown to add a multiplier effect to patrol coverage.  One study shows that patrol officers complete their patrol coverage duties up to three times faster and can do so more frequently when using a Segway versus walking.  The Segway improves visibility, promotes interaction with customers and employees, improves response time and reduces fatigue, and is adaptable to many settings, including indoor and outdoor environments.

IPC Tacoma Mall Security Sergeant Bursott was asked, "Do you think having video cameras in the mall would have stopped Mr. Maldonado from doing anything?"  She replied, "No, I think when somebody's crazy and has mental problems, that -- and they're going to do something and put that in their head, they're going to go do it.  There's nothing nobody could have done, in my opinion, to stop him from doing it." (Bursott Deposition Pages 85:17 to 86:3)

For a moment, let's presuppose an adequate and comprehensive security video system was installed in the Tacoma Mall in 2005.  We know from witness statements that the shooting portion of this incident occurred over a very short period of time.  Assuming that an alert security officer…

- had been monitoring what would amount to multiple security camera screens,
- with what likely would have been dozens of camera images displayed,
- then happen to observe Maldonado in the hallway loading his rifle,
- walk the 40 feet or so directly to the T-Mobile kiosk,
- remove his coat and begin firing the 15 rounds found on the concourse from his rifle while,
- walking past four store fronts to then enter the Sam Goody music store,
- all within +/- 60 seconds…

I do not believe that in that short period of time a monitored security camera system would have made a difference in the outcome of the event.  Therefore, I am not of the opinion that the absence of security video had any causation in this case.

T-Mobile Kiosk employee Torres wrote, "Mr. Maldonado did a good job of dressing so he wouldn't be noticed, and his weapons were well concealed under his overcoat.  Further, less than thirty seconds after walking into the mall, he dropped his jacket and began firing his rifle without any kind of warning.  I observed him this entire period of time, and didn't detect anything out of the ordinary before his jacket fell off.  He didn't say anything.  He just opened fire.  In my opinion,

1   nothing could have been done to prevent Mr. Maldonado's actions". (Torres Declaration, Page
2   3:13-18).
3
4   Plaintiff's Expert Bob Wuorenma was asked, "So what I'm curious about is, is there something
5   that you believe my clients should have done, either the mall or IPC should have done between
6   the time the shooting started and the time the police were called that would have made a
7   difference in outcome here?" He answered, "I don't know if it would have made a difference in
8   the outcome, but I'd have to say that the officers did a reasonably good job of coming from the
9   security office and responding". (Wuorenma Deposition, Page 95:14 to 95:22)
10
11   From what I can determine in my research, after a rigorous evaluation of their operations, policies
12   and procedures, IPC was one of the first security companies in the United States to be awarded
13   accreditation from the U.S. Department of Homeland Security SAFETY Act.  The SAFETY Act
14   liability protections apply to a wide range of technologies, including: products, services, software
15   and other forms of intellectual property that are designed or modified to identify, detect, deter,
16   respond to, or otherwise mitigate the impact or harm arising from an Act of Terrorism.  Protections
17   apply only to claims arising out of, relating to, or resulting from an Act of Terrorism.  Plainly put,
18   IPC security services exceeded many other like entities when it came to best-practices in
19   deterring a terrorist attack at an American mall.
20

 **IPC** International Corporation: Security Services

September 06, 2005 - **IPC** International Corporation's *Security Services* provides unarmed physical security services at commercial facilities. These services can include access control, security patrols (interior and exterior), guard training, alarm system monitoring, emergency response and reporting, video monitoring, physical security site surveys and qualification, training and deployment of personnel. This Designation and Certification will expire on July 22, 2010.

 **IPC** International Corporation: Security Services

November 12, 2010 - – **IPC** International Corporation provides *Security Services*. The Technology is unarmed physical security services at commercial facilities. The Technology also includes support services, documentation, etc. This Designation will expire on December 31, 2015.

21
22
23   **HIRING—SECURITY OFFICER**
24   A common claim in security negligence cases allege that the competency of the security officer
25   and employee hiring process was inadequate.  The negligence theory alleges that the offending
26   security officer should not have been hired, and if instead a competent security officer had been

1    in his place, the plaintiff would not have been injured.

2

3    In the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of*

4    *Large Retail Malls to Prevent and Respond to Terrorist Attack* surveyed mall security directors

5    about qualifications for hiring new employees.

6    • Nearly half of respondents had education standards, most often a high school diploma or

7       GED;

8    • Very few malls required advanced education of new hires;

9    • About one in three respondents said that they had experience requirements including prior

10      law enforcement, military, or security experience and/or state certification;

11   • And, less than one in ten indicated that they had age requirements;

12   • About the same proportion said they had other requirements, including a valid driver's

13      license or clean driving record.

14   The following tables numbered 6 and 7 were obtained from this 2006 study.

Table 6. Hiring standards for mall security staff

| Minimum qualifications in terms of education and experience for security staff | Responses (n=276) | Percent |
|---|---|---|
| Education/skills | 133 | 49.2 |
| High school | 86 | 31.1 |
| GED | 35 | 12.7 |
| Some college | 7 | 2.5 |
| Verbal/written skills (English) | 3 | 1.1 |
| A.A. or B.A. in criminal justice | 2 | 0.9 |
| Experience/Training | 88 | 31.9 |
| Security experience | 24 | 8.7 |
| State certification/license/training | 16 | 5.8 |
| General experience | 10 | 3.6 |
| No experience/qualifications | 10 | 3.6 |
| Law enforcement experience | 6 | 2.2 |
| In-house training | 6 | 2.2 |

15

| Minimum qualifications in terms of education and experience for security staff | Responses (n=276) | Percent |
|---|---|---|
| Military experience | 5 | 1.8 |
| Off-duty police officer/deputy/some police officer training | 3 | 1.0 |
| Peace officer | 2 | 0.7 |
| Corrections experience | 2 | 0.7 |
| Other | 4 | 1.6 |
| Age requirements | 22 | 7.9 |
| At least 18 years of age | 12 | 4.3 |
| At least 21 years of age | 10 | 3.6 |
| Other employment requirements | 33 | 12.0 |
| Clean record | 13 | 4.7 |
| Valid driver's license | 7 | 2.5 |
| Drug test | 4 | 1.4 |
| Other | 9 | 3.4 |

Table 7. Background checks for mall security staff

| Type of background check conducted on new employees | Responses (n=118) | Percent |
|---|---|---|
| Criminal background checks only | 48 | 40.7 |
| Drug tests only | 1 | 0.8 |
| Both background checks and drug tests | 65 | 55.1 |
| Neither background checks nor drug tests | 4 | 3.4 |

In regard to pre-employment screening, IPC Senior Vice President of Security Donald Lantz was asked, "What kind of background investigation (do you conduct)?" "A fairly complete background investigation; so criminal. Any listed employers are contacted, the county and state of residence are checked for criminal background, and any listed county or state or city that they have lived in prior to are checked for criminal background. (Lantz Deposition, Pages 24:18 to 25:2)

I found that IPC Tacoma Mall met or exceeded pre-employment screening efforts of other like entities, and met or exceeded those standards mentioned in the tables above. The IPC Tacoma Mall application and screening process consisted of:

- Preliminary Employment Application
- Employee Application
- Background Authorization Form
- Verification of high school or college diploma
- Applicant Evaluation Form
- Medical History Questionnaire
- Workplace Harassment Policy Acknowledgement

- Policy Acknowledgment/New Employee Probation Form
- Employee Uniform Inventory Sheet
- Federal, State Tax and Immigration Forms
- Employment Agreement
- Application and Registration for Washington State Security Guard Card and
- I.D. Card Request Form
- Fingerprint Card
- Supervisor Completion of IPC International Corporation Employee Hiring Procedures form

Prior to a conditional offer of employment, each candidate went through:

- Criminal History Check
- Employment Verification and Reference Check
- *IVR Fastscreen* Psychological Testing

The 2006 DOJ study showed that the high rate of turnover among mall security staff generally lessened the long-term utility of training. Wages in the industry are generally low ($8 to $11/hour) with little room for advancement. Most security directors said that they experienced 100% turnover within a year. When security personnel leave a mall, the investment in training leaves with them; the effect of the high turnover is that, at any given time, the security staff includes a good number of new recruits who are inexperienced and have not received anything beyond basic training.

In review of provided IPC Tacoma Mall employee files, I found that on or about the time of the shooting incident, IPC paid its officers an hourly rate ranging from $ 8.50 to $13.66 per hour. These hourly pay rates were at or exceed the national average. (*Reference*: Employee Files)

Additional benefits for qualified IPC security candidates included a medical and dental plan, sick pay, and a 401(K) program; not typical for most security guard positions.

In his deposition, Plaintiff's expert Wuorenma was asked, "It is not your present opinion that there was a negligent hiring of security guards by Simon; is that right?" He answered, "No. I've had no facts to prove otherwise". (Wuorenma Deposition, Page 133:12 to 133:14)

In 2005, IPC Tacoma Mall met much of or even exceeded the recommendations of the later published 2009 American Society for Industrial Security *Pre-Employment Background Screening Guideline.*

## TRAINING—SECURITY OFFICER

Another common assertion in security negligence cases concerns the competency of the officer and adequacy of their training at the assigned post. The negligence theory alleges that the offending security officer should have been trained better or to a standard, and if a knowledgeable officer had been in place, the plaintiff would not have been injured.

In the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack*, participants were asked how many hours of training new employees receive.  Training averaged about a week (mean = 45.1 hours; median = 40 hours).  The vast majority of new employee training was either done in-house (50%) or by the parent security company organization (31%).  Local government entities (police, fire, or state/county officials) together conducted training at 17% of the sites.

In his deposition, IPC Tacoma Security Director, Rick Erdie was asked about his training.  "How were you trained for your position as director of public safety and security at the Tacoma Mall?"  He answered. "I went through the same 40-hour training that all new employees went through for IPC".  He was then asked, "Did you receive materials for that training?"  He answered, "Yes. There was a training manual that was used with some videos, and...".  (Erdie Deposition, Page 16:10 to 16:16)

The legislative standard for security guard training in Washington State is found in RCW 18.170.105:

*(c) Security guards licensed between January 1st and June 30th of any calendar year may receive eight hours of initial post-assignment training any time between the day following the issuance of a temporary security guard registration card with their company and June 30th of the year following initial issuance of their license by the department.*

*(d) Security guards initially licensed between July 1st and December 31st of any calendar year may receive eight hours of initial post-assignment training at any time between the day following the issuance of a temporary security guard registration card with their company and December 31st of the year following initial issuance of their license by the department.*

*(4) Following completion of the pre-assignment and post-assignment training, at least four total hours of annual refresher training shall be administered to security guards each subsequent year. The subsequent year begins, for refresher training purposes, the day following the last date the security guard is required to receive the eight hours of initial post-assignment training. No more than one hour per year of annual refresher training may focus directly on customer service-related skills or topics and the remaining three hours per year of annual refresher training must focus on emergency response concepts, skills, or topics including but not limited to knowledge of site post orders or life safety.*

Pre and post-employment training for IPC Tacoma Mall security personnel included the following areas:

1. State of Washington required pre-assignment security officer training in the following areas, as well as, a completion of a 30-question exam prior to licensing:

   State of Washington Pre-Assignment Training Guide
   - Basic Principals to include role of security, law, observation, proper actions, terrorism and surveillance
   - Legal Powers of Arrest; citizen, authority to detain, questions, search, use of force, avoiding liability and building relationships with law enforcement
   - Emergency Response; fires; medical emergencies; and criminal acts
   - Safety and Accident Prevention and Reporting
   - Report Writing

2. IPC Pre-Assignment Training included the following structured training from the published IPC Pre-Assignment Training Guide:

   - Customer, Tenant and Public Relations
   - Relations with Civil Authorities
   - Relations with Center Management
   - Workplace Safety and Health
   - Hazardous Communication Standard
   - Vehicle Safety
   - Workplace Harassment
   - Housekeeping
   - Liability and the Law
   - Emergency Guidelines to include evacuation and emergency communications
   - Emergency Procedures
   - Observation Skills
   - Patrol Procedures
   - Report Writing
   - Parking Lot Security
   - Legal Powers and Limitations
   - Special Situation Scenarios and Exercises
   - Fire Alarm Systems and Control Devices
   - Medical Emergencies
   - Surveillance
   - Testifying
   - Shoplifting
   - Structural Damage
   - Tenant Lease
   - Major Emergency Exercise

3. Additional Pre and Post-Employment Training of Simon Property materials included:

   Simon Field Policy Manual:
   - Security Evaluation
   - Professional Standards of Conduct
   - Patrol Duty Functions to include patrol vehicle function

- Building patrol
- Communications and Radio Procedures
- Field Reports
- Customer/Community/Tenant Relations
- Safety and Order Maintenance
- Security and Crime Prevention
- CCTV Signage
- Mall Emergency Procedures

SHARP (Simon Homeland Action Response Plan) Manual
- Color Coded Threat Levels
- Evacuation Procedures
- Emergency Response Plan
- Disaster Plan and Guidelines
- Emergency Response Team
- Interaction with Local Authorities
- Event Preparation, Planning, Training and Monitoring
- Vehicle Regulation and Traffic Restrictions
- Tenant Communications
- Public Relations and Media Communications
- Corporate Communications
- Contractors and Construction
- Public Transportation
- Security Training
- Security Equipment
- Security Planning
- Security Deployment, Patrols and Monitoring
- Access Controls and Badging
- Protection and Assets and Secure Operations
- Suspicious Persons and Packages

4. IPC Post-Deployment Training included the following structured training from the published IPC Continuing Education Training Series:

- Workplace Harassment
- Cultural Diversity
- Policy and Procedure Review
- Handcuff Procedures
- Driver Safety
- Bicycle Patrol
- Preventing Disease Transmission
- Holiday Season Procedures
- Patrol Strategies and Techniques to include patrol function, risk analysis, crime prevention, deployment, patrol techniques
- Workplace Safety
- Tenant Relations
- Shopping Center Industry Overview
- Fire Prevention and Response
- Report Writing
- Cultural Diversity and Sensitivity

- Testifying in Court
- Traffic Direction and Control
- Materials Resource Library Catalog with dozens of security-related documents
- Stance and Relative Positioning
- Verbal Communication Techniques
- Scene Management

Additional post-deployment training included instruction on:

- Operation and training on the use of the Segway two-wheel security vehicle with a 20-question written test.
- Operation and training on the use of IPC security motor vehicles with a 10-question written test and a 10-question driving survey.
- Operation and training on the use of IPC security bicycle with a 50-question written test.

It also appears that all IPC Tacoma Mall employees attended CPR, first aid, and AED training.

I found several instances where IPC Tacoma Mall personnel were selected for Regional Trainer responsibilities. Additional training and the passing of a 100- question test was required for this position.

IPC Tacoma Mall employees selected for supervisor positions received further Supervisor Development Training and subsequent testing.

IPC Tacoma Mall Security Sergeant Bursott was asked about additional training; "Other than the CPR and -- what was the other training that you took when you started?" She replied, "Well, I know that we did classes once a month. So in the time I was there, you know, I probably went to thirty-something classes. You know, every -- it was mandatory to attend, so everybody had to attend them for a two-hour session". (Bursott Deposition, Page 57:5 to 57:11)

In a following question, Bursott, was asked, "But you remember there being training every month?" She answered, "Yeah. And I know for sure there was one on terrorists. You know, we had them on earthquakes; we had them on suspicious people; you know, calming people down insinuations that were getting out of hand or dealing with angry people". (Bursott Deposition, Pages 81:13 to 81:18)

The IPC Training Record/Acknowledgement Training Form shows written documentation of each employees training history with dates and verification of completion of the difference levels and phases of training by the training officer. (*Reference*: Employee Files)

In 2005, IPC Tacoma Mall met much of or even exceeded the recommendations of the later published 2010 American Society for Industrial Security *Private Security Officer Selection and Training Guideline*.

## STAFFING LEVEL—SECURITY OFFICER

A common allegation in security negligence cases is that the defendant failed to hire an adequate number or no security officers to protect a high-crime property. The negligence theory asserts that plaintiff would not have been injured if an adequate number of security officers were present.

The number of security staff needed to adequately protect a location varies depending on the size of the property, the nature of the premises, and crime foreseeability.   Information from the following areas could be useful in determined staffing adequacy:

1. Staffing schedules which show security officer deployment for various days of the week and number of shifts per day.
2. Security budget for comparing the security expense percentage to the total operational budget to assess whether security expenditures have risen or fallen with incident levels.
3. The initial proposal, assessment, written contract, post-orders, and invoices may also provide useful information required for analysis.
4. Requesting all written daily activity and incident reports for at least two-years will supply information about the actual duties performed and activity found on the property.
5. Lastly, reviewing employee depositions, statements, interviews, and crime statistics.

There may be numerous other factors to consider, depending on the incident, such as customer service efforts, tenant service, mall operations, neighborhood considerations, nearby events, etc.

Tacoma Mall Manager Steve Heim was asked, "So you never anticipate more acts of criminal activity or violent activity when there are more people in the mall? His answer was, "No". He was then asked, "Do you ever consider the causes of criminal activity or violent activity in the mall?" He answered, "yes".  Heim was then asked, "When you are performing that consideration, what do you consider those causes to be?" He answered, "Well, depending on the circumstance, we'll look at what may have caused it".  (Heim Deposition, Page 17:3 to 17:24)

IPC Tacoma Mall Security Director Erdie was asked, "In your mind, when did the seasonal coverage start?  Was that November through the end of December?" He answered, "Those 1,100

hours began the day after Thanksgiving and ran through January 1st. And that was the same every year." A follow-up question was posed, "Did you normally see an increase in mall activity the week before Thanksgiving?" He answered, "No, not normally". (Erdie Deposition, Page 34:1 to 34:20)

IPC Tacoma Mall Security Sergeant Bursott was asked, "How busy was it that day (Sunday, November 20, 2005)?" She answered, "It was very slow." The next question was "What do you mean by "very slow?" Can you quantify that for me?" She answered, "On Sundays, there's maybe -- not even half of the people there as on a Monday, Tuesday, Wednesday, during the weekdays". (Bursott Deposition, Page 82:2 to 82:12)

IPC Tacoma Mall Security Kim was asked, "What kind of seasons were the busiest?" He answered, "Christmas". He was then asked, "About when did that begin?" His answer was, "I observed it probably two weeks before Christmas." The next question, "So there would be more patrolmen on watch during the Christmas shopping season?" He said, "That's what I observed". (Page 31:7 to 31:13)

Apparently the Food Court, at times, had a higher security incident rate. IPC Tacoma Mall Security Officer Tacconelli was asked, "Is that why you posted extra officers at the food court?" She answered, "On occasions, yes. It was just higher activity, and there was a higher--there were more youth that would be in the food court". (Tacconelli Deposition, Page 37:16 to 37:20)

IPC Tacoma Mall Security Sergeant Bursott was asked, "What would you do to try to prevent crimes before they started?" She answered, "If we would get a call from a store manager saying that people were in there, they thought they were going to shoplift and they were watching, we would just go hang out, walk around the store, stand really close to them, let them know we're on them". (Bursott Deposition, Pages 72:22 to 73:4)

In regard to a security officer response perspective, Tacoma Police Detective Graham was asked in his deposition, "Do you think they are in any way equipped to respond to an active shooter?" He replied, "Depends on what the response is, what you mean by "response". Do I think they're in a position to confront and take down an active shooter? No, I don't." The follow-up question was, "Again, I know this was what you previously said, but the ideal response, from your perspective, would be for them to report the incident to law enforcement and do what they could to evacuate the mall? To which he replied, "Correct". Questioner: "And then get out of the way?"

1  Graham said, "And then stand back to advise the incoming units on locations and positions".
2  (Graham Deposition, Pages 32:21 to 33:12)
3
4  I asked myself the question, "for planning purposes, what would be the staffing requirements
5  necessary to properly respond to an active shooter at the Tacoma Mall?  How many people would
6  it take?"  In reviewing the Tacoma Police report I learned that 135 law enforcement officers from
7  multiple jurisdictions with a yet-to-be determined number of firefighters, paramedics, and
8  ambulance drivers were present throughout the afternoon and evening.  Among other tasks, law
9  enforcement responders served the property-wide function security of containment, mall
10 evacuation, and physical security.  From reading materials provided to me, this appears to be the
11 same expectation Plaintiff made of IPC Tacoma Mall Security.  My opinion here is that it would
12 be quite unreasonable to expect IPC Tacoma Mall to have on staff even a portion of this number
13 of security officers, available at a moment's notice to respond to a critical incident.
14
15 In my review of IPC Tacoma Mall incident reports and other documents provided to me, I did not
16 find any reference to security officers having multiple calls for service in any way delaying their
17 response to any one incident.  Nor could I find any reference where calls for service deterred or
18 detracted from security officers completing their assigned rounds.
19
20 Sergeant Bursott was later asked, "Given what you know about Mr. Maldonado, do you think any
21 number of security guards in the mall would have made a difference on what he did that day?"
22 She answered, "Absolutely not.  No." (Bursott Deposition, Page 85:4 to 85:9)
23
24 **SUPERVISION**
25 Another common assertion in security negligence cases argues that security personnel were not
26 properly supervised and therefore failed in their duties.  The negligence theory is that the officer's
27 performance was substandard or inadequate and had there been proper supervision, the security
28 officer's actions would not have prevented injury.
29
30 At locations where multiple security guards are utilized, it is important to evaluate the level of
31 supervision provided. The burden of supervision ultimately belongs to the responsible premises
32 operator. However, the task of supervising the security function is often delegated to a security
33 director or contract guard agency.
34

Supervision of security officers is most commonly accomplished by requiring written daily activity reports and using an electronic or mechanical guard tour device, both of which were in place at the time of the incident.

Evaluation of all written security activity and incident reports for a two-year period prior to an incident is generally adequate. These reports are often the best record of unreported criminal activity on a property. Incomplete or missing reports are sometimes indicative of an inept security guard patrol. Conversely, good documentation of diligent security patrols depicts proactive security coverage. In this case, we have access to five years of incident reports and incident statistics.

IPC Senior Executive Vice President Donald Lantz was asked, "Are these periodic reviews official reviews? Are they reviews that the corporation undertakes at a certain period of time or are they done—". He answered, "Regional managers do them during visits to the property, group vice presidents may do them through visits to the property". (Lantz Deposition, Page 80:8 to 80:13)

Simon Properties Vice President of Security Donaway was asked, "When you say "oversee," could you elaborate a little bit on that?" He answered, "The corporate division of Simon, which there's three of us in that-- there's two corporate security directors, one vice president of security. A security strategy is set forth by the company, and then the four security providers are required to execute that strategy using their expertise and their experience as national security providers. I will go around and visit properties and see how the security is operating. A lot of times those visits are unannounced. I will interact with-- each of those companies has a national account manager that oversees the Simon account for their book of business with us, and I will meet with them-- almost talk to them on a daily basis about anything and everything regarding their security operations and deal with any security issues they may be having at our properties". (Donaway Deposition, Pages 7:8 to 8:1)

To self-assess its service levels, Simon Property Group utilized random "secret shoppers" who provided a two-page "Simon Guest Services Shop" of various mall operations and services, to also include security. Documentation of these surveys are also found in employee files.

In review of IPC incident reports, it was not uncommon to see that IPC supervisors (Corporals and Sergeants) responded to calls with officers. While on scene, the supervisors were able to supervise their subordinate's actions and oversee customer service, train, and mentor their staff.

I learned from a review of Daily Reports that IPC Tacoma Mall shift supervisors completed in detail, at a minimum, several shift supervisory forms to include the Supervisor's Shift Summary, Shift Supervisor Check List, and the Security Duty Flow Worksheet. (*See* Daily Reports)

Further, in my review of provided employee files, it was not uncommon to see numerous supervisor's documents to include corrective action, termination letters, memorandum, Personnel Action Notices, Exit Questionnaires, Notice of Employee Reprimand, Service Commendation Awards, Employee Appreciation Awards, Security Call Off/Late Attendance/Incomplete Shift Reports, Verbal Counseling Forms, Formal Counseling Notice, Personal Trait Evaluations, and Annual Performance Evaluations. Unsupervised employees would not necessarily have this type or level of documentation in their files.

As I describe in the list of documents mentioned in the paragraph above, I am not finding any reference to anything other than strict supervisory oversight of security officers.

**POLICY AND PROCEDURES**

At larger security companies, such as IPC, policies and procedures commonly take the form of training manuals. Smaller companies tend to use less effective forms of communication such as email, directives or memos.

Compliance and enforcement of those rules and regulations are important to make a property reasonably safe. Corporate policies and procedures, when first published, represent what could be considered the highest intentions of an organization for safely operating their business. However, sometimes these intentions are not reflected at the local property level. Inconsistencies are sometimes exposed during premises liability litigation and pose problems for a defendant especially if following the policy would have prevented plaintiff's injury.

Security procedures can weaken over time unless closely supervised and reinforced. Also, in times of a challenging economy, businesses will sometimes cut certain security processes. It is not uncommon to find security coverage lessened, or was even eliminated, and reporting of security incidents declined. For a variety of reasons, these cuts often do not get reinstated. Perhaps the need is forgotten. In premises liability cases, out-of-date, non-existent or skeletonized policy and procedure manuals can prove to be damaging at trial.

Both Simon and IPC Tacoma Mall had extensive security policy and procedure manuals <u>totaling over 632 pages</u>. From the documents provided to me, I determined that the *IPC Mall Public*

*Safety Services Policies and Procedures Manual* consists of 142 pages; the Simon *SHARP* (Simon Homeland Security Action Response Plan), addendums and attachments consists of 360 pages; and the *Simon Field Policy Manual* consists of 130 pages. In my review of both incident reports and employee files, I saw nothing that would lead me to believe that IPC Tacoma Mall security management or officers were not following those document requirements.

Policies and procedures often become relevant in premises liability litigation if failure to execute them was a proximate cause of the suit. That is not my opinion in this case.

**RELATIONSHIP WITH LOCAL LAW ENFORCEMENT**

In the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack*, participants reported a wide variation in how local law enforcement and regional terrorism task forces had been involved in mall security. The assessment showed that malls generally had a close relationship with local law enforcement. These relationships were sometimes driven by state homeland security plans that included malls in risk assessments of critical infrastructure. In other cases, former law enforcement personnel are now mall security directors still have personal ties to their agencies. In still other cases, professional relationships were formed by police officers stationed in the mall or off duty work opportunities. Security directors in the study reported that their police officer contacts would usually be open to sharing relevant security information.

IPC Tacoma Mall Security Director Erdie was asked to explain what the relationship with the Tacoma Police Department had been and why. He responded, "Well, when I first got there, there virtually was no relationship with the police as far as the security office was concerned. And I believe that stemmed from personalities that were there at the time. The mall management, as far as I know, always had a good relationship with the Tacoma police, and -- and by the time I left the mall, I believe we had a very good relationship with the police". (Erdie Deposition, Page 39:7 to 39:16)

Conversely, the study also found malls that had little relationship with local law enforcement. These malls were generally not privy to police intelligence data and did not participate in risk assessments or emergency plans. For example, in a discussion with local first responders at one location, both police and fire officials acknowledged that, although they probably should have established contact people in major stores in the local mall, mapped out exit routes, and created an evacuation plan, they had no plans to do so.

In a telephone interview on March 16, 2016, IPC Tacoma Mall Security Director Erdie shared with me that he worked diligently with the Tacoma Police Department to build a relationship of trust and confidence.   He elaborated that when he was first appointed to Director until the day he departed, there was a significant strengthening of the relationship and trust between the two agencies.

In the study mentioned above, none of the malls amongst the eight visited conducted joint exercises with local first responders and law enforcement. Neither did the Tacoma Mall.  There seemed to be two reasons for this: sometimes local law enforcement did not consider malls a high priority target and had decided to expend their efforts on other types of facilities.  But more often, it was the malls that resisted because they could not find a convenient time, disinterested tenant participants, or did not want to alarm the public.  Unfortunately, today we know this situation represents a large disconnect in response to emergencies.

In his deposition, IPC Tacoma Mall Security Director Rick Erdie was asked, "Do you recall, did you see an increase in the number of security incidences that were being reported after that (Police) substation closed?"  He answered, "no".  (Erdie Deposition, Page 41:3 to 41:6)

As was at the Tacoma Mall in 2005, most mall security forces have conceptualized their role in emergencies as an initial "triage" force that will rapidly hand off the incident to arriving first responders.

**OPINION:** Traditional or conventional security measures would likely have not stopped the premeditated, focused and driven Dominic Maldonado who was intent on taking hostages to gain attention for alleged misdeeds.

The challenges of employing these security measures were likely further compounded by Maldonado's diagnosed mental disorders and suicidal thoughts, alcohol, and drug abuse (unknown pills in "orange bindles", Marijuana, and Methamphetamine).

In November of 2005, it is my opinion that IPC Tacoma Mall Security met or exceeded responsibilities in their duty or standard of care to provide a safe and secure shopping environment for customers and that in review of the totality of circumstances, neither a visible, unarmed security officer nor visible or monitored security cameras would have deterred or stopped an armed Dominic Maldonado from his actions.

# FINDING: FORESEEABILITY

In December 2006, the United States Department of Justice published a document entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack*, the authors describe that "*one reason is that the nature of malls makes them very vulnerable: there are multiple entrances and exits, and they are open to the public. Large numbers of people come and go, making it easy for potential terrorists to blend in unnoticed. Many of the visitors carry large parcels that could hide a bomb or other weapon. There are multiple ways to attack a mall, ranging from automatic weapons to car bombs to bombs placed inside the mall, even to an attack using a biological or chemical agent.*" I make this point to outline some of the many challenges a mall owner has to secure their property.

On April 20th, 1999, two Columbine High School students in Littleton, Colorado massacred 12 of their fellow students and one teacher, injuring 21 others. Their complex and highly planned attack involved a fire bomb to divert firefighters, propane tanks converted to bombs placed in the cafeteria, 99 explosive devices, and car bombs. This was the pivotal event which led to what is now known as an active shooter event.

I remember clearly the terrible events of September 11th, 2001. The images viewed on television news will be forever imprinted on our minds. As a result, the threat of terrorism became the unfortunate focus in many aspects of our lives. Beginning almost immediately, and over the many years that followed, we have planned and prepared for the unthinkable.

With that said, I would like to address the shooting incident at the Tacoma Mall on November, 20th, 2005. The incident was NOT a terrorist event. Maldonado had no religious or political agenda. Reference to terrorism or like implication as such would be incorrect.

Further, it is debatable if this incident by definition was an "active shooter" event (*See* definition in Appendix 6). I have not seen any facts leading me to believe Dominic Maldonado attempted to kill anyone. Maldonado was eventually charged with and plead guilty to eight counts of first-degree <u>assault</u>, four counts of first-degree <u>kidnapping</u>, and two counts of unlawful possession of a firearm; not attempted murder nor terrorism. Even though in portions of the report to follow, the term active shooter is used, it is my opinion that the correct and most accurate descriptor of this incident is a rampage shooting or rampage shooter.

In the 2013 Federal Bureau of Investigation study, *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*, the authors found only <u>one</u> indoor mall shooting before

1  November 2005.  The shooting occurred in February 2005, a 24-year-old male named Robert
2  Bonelli entered the Hudson Valley New York *Best Buy* store with a rifle and fired several shots
3  into the floor.  He then walked out of the *Best Buy* store into the Hudson Valley Mall concourse
4  where he continued firing until his magazine ran out of bullets.  Two persons were injured.
5
6  In my research, I did find one other indoor mall shooting which occurred in July 1985 at the
7  Springfield, PA shopping mall.  A 25-year-old mentally ill female named Sylvia Seegrist shot and
8  killed two men and a two-year-old boy, wounding seven others.
9
10  Even though malls have multiple entrances and exits, are open to the public where large numbers
11  of people come and go, the study is clear, shopping malls are NOT "high risk" areas.  To put this
12  in perspective, I again refer to the 2013 Federal Bureau of Investigation study, *A Study of Active*
13  *Shooter Incidents in the United States Between 2000 and 2013.*  Taking into account nearly
14  a decade of post-2005 shooting statistics noted in the 2013 study, 45.6 percent of incidents occur
15  in places of commerce, 27.5 percent occur in businesses open to the public, 14.4 percent occur
16  in businesses, closed to the public, and 3.8 percent occur in malls and houses of worship.
17
18  Other areas analyzed included educational institutions accounting for 24.4 percent of all active
19  shooter incidents, with another 10.0 percent of those on government property, 9.4 percent in
20  public spaces, 4.4 percent in residences, and 2.5 percent in health care facilities.  Again, this
21  report was published in 2013.
22
23  IPC Vice President of Security Donaway was asked, "And how do they (the security guard
24  contractor) sell that (security budget) to you? He answered, "They go in and do an assessment
25  of the property because that's what they do. They come back to us and give us a proposal to tell
26  us how many contract hours they feel it's going to take to adequately secure that property".
27  (Donaway Deposition, Vol 1, P44:19-23)
28
29  When asked if his security contractors could exaggerate on hours needed to fulfill their contract,
30  Donaway replied, "They (security vendor companies) do a very good job of going in and doing an
31  adequate and accurate-- which is the word I meant to say, which is an accurate assessment of
32  what the security needs are for a property. I think that's (exaggeration) implausible." (Donaway
33  Deposition, Vol 1, P45:6-9)
34
35  We know that IPC Tacoma Mall conducted annual need-based review of incidents to determine
36  following year budgeting and staffing requirements.  In this regard, Donaway was asked, "When

1   a security company proposes that you increase or Simon increases the budget for security at a
2   particular mall, what do they use to justify that?" To which he answered, "To increase the contract
3   hours at the property, you would have to justify it with the incidents that are occurring on the
4   property". (Donaway Deposition, Vol 1, P45:22-25 – P56:1-2)
5
6   IPC Tacoma Mall Security Director, Rick Erdie in his interview with this expert stated that, "An
7   annual security assessment was conducted by Simon Properties Mall Manager Steve Heim and
8   IPC Regional Director of Security Kirk Barnett" in order to "determine the (following year's)
9   budget".
10
11  We know that incidents drive budgets. The more incidents, the greater potential for an increased
12  budget. When asked about what he expected out of his security officers, a portion of Donaway's
13  response referencing incident reporting was, "...we expect them (security officers) to write reports
14  for incidents that do happen so they can be analyzed and so we can make necessary adjustments
15  to address any trends or issues, and any other duties". (Donaway Deposition, Vol 1, P68:7-10)
16
17  Plaintiff's Expert William Nesbitt provided a CAP Index CrimeCast Report for the Tacoma Mall
18  site.  The CAP Index is a private organization that claims to provide a crime vulnerability
19  assessment for any location in the United States and Canada. They state their reports "assess a
20  wide variety of information from neighborhood demographic and physical housing data, FBI
21  Uniform Crime Reports, National Crime Surveys, local police data and company crime reports to
22  provide a "forecast" intended to indicate the likelihood of crimes occurring in any location".
23
24  For reference purposes only, report scores are based on a scale of 0 to 2000, with 0 representing
25  the lowest risk and 2000 the highest – 100 is average. For example, a score of 600 is six times
26  higher than average, and score of 25 indicates that the risk is ¼ of the average.
27
28  This CAP Index CrimeCast Report provided to me shows that crime (homicide, rape, robbery,
29  aggravated assault, crimes against person, burglary, larceny, motor vehicle theft and crimes
30  against property) in a three-mile radius of the Tacoma Mall were over 3½ times (**364**) the national
31  average. What this report implies is that the average person visiting the mall is over 3½ times
32  more likely at risk of being a victim of a crime against their person or property as compared to the
33  rest of the nation.
34

Index numbers are also given for county and state comparisons.  A score of **466** was shown that the average person visiting the mall is over 4½ times more likely at risk of being a victim or a crime against their person or property than elsewhere in the <u>state</u>.

A score of **505** was shown that the average person visiting the mall is just over 5 times more likely at risk of being a victim or a crime against their person or property than elsewhere in the <u>county</u>.

I find this report, in and of itself, problematic for the following reasons:

1. Looking at the user-defined three-mile scoring radius on the Report Map, crossing freeways and spanning into distinctly different sections of the city, Mr. Nesbitt included the Hilltop Neighborhood which is notorious for drug-related gang activity, most notably related to the infamous *Hilltop Crips.* The word "Hilltop" became synonymous specifically with Tacoma's gang problems, and more generally with urban pathologies associated with the country's crack epidemic.  The CrimeCast report numbers in those areas of the map are pink and red in color denoting crime as <u>five to eight times higher</u> than the national average. As a result, these numbers significantly skew the results of the Tacoma Mall site report.

2. The areas within the one-mile yellow area on the Report Map show crime to be approximately 1½ times the national rate, significantly lower than the larger footprint three-mile radius.  The neighborhood southwest of the Tacoma Mall actually shows crime to be <u>less than</u> the national average (.77).  It is my opinion that in a congested urban setting, such as the Tacoma Mall location, a one-mile radius is more than adequate to assess crime statistics.

3. According to the provider, CAP Index, the referenced report was prepared using "sophisticated econometric forecasting techniques".   However, the report is not accompanied by an affidavit or testimony of someone qualified to interpret the science and methodology of behind it.  The "computer modeling" used to create the report findings is proprietary information, not known to the consumers of the product or the public.  As Dr. Kennedy stated, "(the) *CAP Index (CrimeCast Report) is basically simply converting census data into some theoretical crime value, and its formula is so misunderstood, while it's not really known because it's originator never told anybody, and if you were to ask the (company) president to explain the formula behind it, you're not going to get an answer because he's essentially, I believe, an attorney and not a statistician or a criminologist".* (Kennedy Deposition, Page 43:5-13).

4. Neither the CrimeCast map or report, in absolute terms, indicate that the <u>specific geographical site</u> of the assessment is a high-crime area.  Only that it is higher or lower

than the average for some area other than the site location being assessed. Therefore, I ask, is the elevated crime rate of Pierce County, on its own, sufficient to prove foreseeability for a fixed or specific location within the county such as the Tacoma Mall? I do not understand how that claim can be made.

5. Neither the CrimeCast map or report clearly <u>define the boundaries</u> of the geographical area assessed. How do we know for certain whether crime can be accurately predicted for a specific location based on statistics of crime occurring several miles or more away? Again, we are left wondering if this report accurately represents foreseeability of crime at the Tacoma Mall. CAP Index, on their website, recommends, "We advise, however, that companies make an effort to accumulate whatever information is available for a given location, including crime loss reports, police data, neighborhood security practices, and any other "due diligence" indicated by local, state and national industry standards".

6. My understanding of the CrimeCast product is that it extrapolates its conclusions from census data that could be up to ten-years-old (U.S. census cycle), undated information from other sources, with what could amount to crime data that could up to two-years-old to produce a number based upon an unknown mathematical computation. In the provided report on the Terms and Conditions page, it reads, "Although these data are considered highly reliable, we are not able to vouch for the completeness or accuracy, and in some instances, …, data showing facility locations may become outdated". I have yet to see this product vetted by an independent third party. Thus, the product may represent area or neighborhood statistics which might not be as accurate as we require.

7. For this report, as noted on its cover sheet, I would like to know why the year 2008 Uniform Crime Report (UCR) data was used. Again, this represents further potential deviation in accuracy of crime statistics for a 2005 event.

When researching CrimeCast report admissibility in foreseeability cases, I found the following references:

1. *Shadday v. Omni Hotel Mgmt. Corp.*, 2006 WL 693680 (S.D. Ind. 2006) finding a CRIMECAST report did not prove foreseeability sufficient to survive summary judgment;

2. *Ali v. Dao*, 2009 WL 2567995 (N.J. Super. A.D. 2009) finding high CAP index was not sufficient evidence to prove foreseeability;

3. *Whitt v. Wal-Mart Stores East, L.P.*, 2010 WL 1416756 (E.D. Ky. 2010) a low CAP index for violent crimes indicated a low risk of a violent crime in Wal-Mart parking;

4. *Currie v. Chevron USA, Inc.*, 2006 WL 5249707 (N.D. Ga. 2006) CRIMECAST report was sufficient to establish lack of foreseeability.

Again, I must emphasize, like many of my security expert peers, I am not qualified to explain the science or methodology behind the CrimeCast report. I recognize that in some assessment scenarios, the CrimeCast report can be a valuable tool. However, caution should be exercised when using this product as a single-purpose tool as it may not necessarily fit every forecasting need. When used in conjunction with a general vulnerability assessment, we must exercise caution with report results so not to dissuade businesses to expand into what CAP Index might classify as higher crime areas, when in fact, the area assessed may not factually indicate as such.

Donaway was asked, "How do you assess what that threat is?" He responded, "You do that through a lot of ways. You look at--with what we can do now with the new guard tour system that I was telling you about-- and you can do day and time analysis and day of the week analysis-- there's a couple different analytics that you can do in there to see when you're having the bulk of your incidents, and then you can take your deployment and put them--adjust that throughout the course of the week to put your security when they are most needed". (Donaway Deposition, V1, P98:4-13)

The document given to me entitled, "Tacoma Mall Query- Security Related Incidents, 2002-2005", it summarizes reported incidents of "assaults, shootings, robbery, child abuse, domestic disputes, threats, and harassment" at the Tacoma Mall from January 1, 2002 - December 31, 2005.

Because I am not aware of the 2002-2005 mall visitor statistics, I will rely upon the figure provided by Simon Properties for the October 10, 2015, The (Tacoma) News Tribune web site article entitled, "*Tacoma Mall: 50 years of retail reinvention*", which reported 13.5 million people pass through the mall doors each year.

I have prepared the following table to put these statistics into perspective.

| Year | Total Incidents | Indoor Common Area Incidents | Outdoor Common Area Incidents | Tenant Space Incidents | Average Days between reported incidents | Opportunity for victimization |
|------|-----------------|------------------------------|-------------------------------|------------------------|------------------------------------------|-------------------------------|
| 2002 | 27 | 11 | 11 | 5 | 14 | 1:49,000 |
| 2003 | 19 | 9 | 9 | 1 | 19 | 1:69,000 |
| 2004 | 38 | 17 | 18 | 3 | 9.5 | 1:35,000 |
| 2005 | 35 | 19 | 15 | 1 | 10.5 | 1:38,000 |

1   As a way of explanation of the above table, in 2005 there were 35 reported incidents for the crimes
2   mentioned above.  The average span of time between reporting of those 2005 incidents was 10.5
3   days.  And one out of 38,000 visitors in 2005 was a victim of one of those mentioned crimes.
4
5   In my review of five years of incident reports from January 1, 2000 through December 31, 2005,
6   I found no incidence of rape, homicide or aggravated assault at the Mall.  During that five-year
7   period, only one robbery and one attempted robbery reported.
8
9   Crime rates obtained from the 2008 FBI Uniform Crime Report (data used in the CrimeCast report
10  referenced earlier) depicted in the table below show crime rates in the city of Tacoma, in general,
11  as significantly higher than what I learned from reviewing security incident reports at the Tacoma
12  Mall location.
13

### 2008 Crime Rates per 100,000 Persons

|              | Local Count | Local Rate | Nat'l Rate | Rate Ratio |
|--------------|-------------|------------|------------|------------|
| Homicide     | 15          | 8          | 6          | 1.2        |
| Rape         | 142         | 72         | 31         | 2.3        |
| Robbery      | 622         | 316        | 196        | 1.6        |
| Agg. Assault | 1,216       | 618        | 315        | 2.0        |
| Persons      | 1,995       | 1,013      | 548        | 1.8        |
| Burglary     | 2,890       | 1,468      | 798        | 1.8        |
| Larceny      | 9,463       | 4,807      | 2,509      | 1.9        |
| Auto Theft   | 2,718       | 1,381      | 382        | 3.6        |
| Property     | 15,071      | 7,656      | 3,689      | 2.1        |
| TOTAL        | 17,066      | 8,670      | 4,237      | 2.0        |

14
15  Mall Manager Steve Heim was asked, "Had the Tacoma Mall ever encountered a shooting before
16  Dominick Maldonado went in there?"  He answered, "No".  A follow-up question was posed, "Did
17  you say earlier there has never been a knife fight at the Tacoma Mall?"  His answer was, "Not to
18  my knowledge".  (Heim Deposition, Pages 60:23 to 61:3)
19
20  Heim was later asked, "Are you familiar with any shootings at the Tacoma Mall, other than the
21  Maldonado shooting?"  He answered, "No".  Heim was then asked, "Has any mall patron ever
22  brandished a firearm that you know of, and by "brandished," I don't mean just carrying a firearm
23  but pulling it out in a threatening manner?" To which he answered, "No". (Heim Deposition, Page
24  68:15 to 68:24)
25

1   Tacoma Police Detective Graham was asked, "Prior to this incident in 2005, had you ever had an
2   active shooter situation similar to this in the Tacoma area?" He answered, "I have not, no. I am
3   trying to think-- I guess the closest that I was, would have been the Trang Dai massacres from
4   1999 when the shooters walked into the bowling alley on 38[th] Street and started shooting". He
5   was then asked for clarification, "And that was-- you think that was in 1999?" His answer was,
6   "1998, 1999". (Graham Deposition, Pages 28:22 to 29:6)
7
8   Later, Detective Graham was asked, "Since this incident or before, have you ever responded to
9   any sort of incident that's similar to this, to the Tacoma Mall shooting in November of 2005?" To
10  which he answered, "I had not, no". The following question was "Would you consider what
11  occurred on November 20th, 2005 as sort of a highly unusual event?" He answered, "Yes".
12  (Graham Deposition, Page 33:13 to 33:19)
13
14  OPINION: Foreseeability in the law of Negligence, is to perceive, know in advance, or to
15  reasonably anticipate that damage or injury will occur from one's acts or omissions.
16
17  There are several ways I look at foreseeability in a negligent security case:
18
19  • **Prior similar acts**. There were no prior similar acts to the incident, and no similar acts
20      since. In *McKown v. Simon Property Group, Inc.*, (No. 87722-0, filed 3/5/15), the
21      Washington State Supreme Court ruled that the prior similar incidents approach assures
22      that businesses will be exposed to liability on this basis only when they have past
23      experience of criminal conduct that makes similar conduct on the business premises
24      foreseeable. Shootings outside the mall are significantly dissimilar to the Maldonado
25      shooting in the mall both by intent and action.
26  • **Imminent danger**. Even though Maldonado telephoned 911 to announce his rampage,
27      he did not express his intent to IPC until the shooting began. Maldonado was an
28      unexpected and unannounced actor.
29  • **Character of business**. First opened in 1965, the Tacoma Mall was in 2005 was a 1.3
30      million square foot, 150-store destination indoor shopping attraction with restaurants and
31      entertainment serving families from many local communities. I have not seen any
32      information from documents provided to me to believe that the Tacoma Mall is a "high-
33      crime" location as portrayed by Plaintiff's experts. IPC incident reports do not portray that
34      picture. Nor am I aware of any tangible demographic to lead me to believe that IPC could
35      have reasonably known or expected such an event to occur.
36

In MacDonald v. PKT, Inc. 464 Mich. 322, 323 (Mich. 2001) the Court explained, "because criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. However, even police, who are specially trained and equipped to anticipate and deal with crime, are unfortunately unable universally to prevent it. This is a testament to the arbitrary nature of crime. Given these realities, it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties".

In *McKown v. Simon Property Group, Inc.*, (No. 87722-0, filed 3/5/15), the Washington State Supreme Court: "an intervening [criminal] act is not foreseeable if it is '*so highly extraordinary or improbable as to be wholly beyond the range of expectability*".

Minor crime typical of a mall or shopping center setting, such as car prowls, shoplifting, minor theft, teenage fisticuffs, domestic disputes, or even an occasional adult assault, robbery or gang activity, does not necessarily equate to an expectation or likelihood of a rampage shooting event.

This is more to the point when the only previous known rampage shooting in Pierce County was in July 1998. (Detective Graham Deposition, Pages 28:22 to 29:6)

Highly motivated and emotionally driven assailants are difficult to deter or stop from their intended actions. Those persons, like stalkers, sometimes wait for the precise opportunity and make repeated attempts at the same target. These driven assailants are not always deterred by the consequence of getting caught. We know from Maldonado's numerous statements that he was seeking attention, and perhaps even force a suicide-by-cop scenario. According to evidence found in his home, Maldonado had been planning this event for several months. As noted above, Maldonado dressed in a manner as to not draw suspicion in advance of his choosing the time and place to act.

As to the provided CrimeCast Report, it is my opinion that the above referenced report does not provide the requisite site-specific accuracy needed for proper evaluation of crime foreseeability, and therefore is not relevant in predicting the occurrence of this incident.

Taking into consideration the year 2005, it is my opinion that this rampage shooting incident was not reasonably foreseeable, therefore it was not reasonably preventable.

# FINDING: PLANNING – EMERGENCY

In the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack*:

- Three out of four (73%) security directors reported that they had developed written protocols for security staff to follow in the event of a disaster.
- The same proportion reported that these plans included coordination and communication with local law enforcement, fire, and medical first responders.
- A much smaller number (3 in 10) had held exercises to rehearse emergency protocols with first responders.
- Most commonly, the exercises were held with local police or fire departments.
- Other malls conducted exercises with EMTs, Red Cross, the Federal Emergency Management Agency (FEMA), or FBI staff.

In the study, malls visited had written procedures to follow in the event of a threat, or in an actual emergency. Malls reported common protocols which included increasing security staff, restricting access, increased surveillance of public areas, and tighter controls over entrances.

A number of malls had standardized procedures for security personnel in the event of a change in the Department of Homeland Security Threat Advisory System. The Simon SHARP manual generally followed these criteria. Procedures outlined steps to be taken in response to a specific threat against the mall, including stepped up patrols and restricted vehicle access.

As was the policy for Simon properties and IPC security officers, in emergencies, protocol for most malls called for contacting emergency services, communicating with designated emergency management staff in the mall (mall owner, security director), providing first aid for any injuries, evacuating people, and/or sealing off an area of the mall.

Of note, in an emergency, none of the malls visited had developed ways to coordinate with police or fire department responders. The sole source of communication was the telephone. In general, the procedure was once police and fire arrived on the scene, they would take charge and mall staff would follow any instructions they were issued by those officials. In my review of provided documents, I did not find any reference to coordinated training with emergency services.

The 2006 USDOJ study showed in general, it was not clear who would be responsible for briefing responders or how mall security evacuation plans would be coordinated given law enforcement's need to retain and interview eyewitnesses.

The authors of the study suggested that an emergency response plan must be well understood by all staff in order to be most effective. Key points in this regard were:

- The authors did not know the extent security staff had internalized these plans.
- In one mall, the security director said that he did not know his emergency procedures and would need to refer to his company's manual in the event of an emergency.
- At two of the reporting malls observed, they carried out exercises to rehearse response to emergencies. In one, the rehearsals were limited to finding simulated bombs and taking appropriate action. In the other, exercises also included a simulated response to a bomb detonation, including evacuating people, setting up triage and press areas, and designating a helicopter landing area.

As for a local reference, I have learned that it has only been the past few years that the Bellevue (WA) Square Mall and surrounding Bellevue Collection retailers participate in a <u>voluntary</u> evacuation drill conducted once annually prior to opening hours.

The study showed the most significant gap in emergency preparedness was the lack of coordination between mall security and the security staff of the large mall anchor stores. In one mall, security could communicate with tenants by radio; but in all other malls, the sole means of communication between mall security and tenants was by phone. In only one mall were tenants involved in the mall's overall emergency response plans. Usually, the decision to evacuate anchor stores and the responsibility to oversee the evacuation was up to store security or store management. In several malls, security directors explicitly told study authors that relations with security staff in anchor stores were minimal or, in one case, even hostile. I did not find any coordination efforts or training with these other security entities.

I further assessed three categories of emergency planning from provided documents. The categories are Evacuation, Response, Emergency Communication.

**EVACUATION**

Evacuation of the Tacoma Mall falls into two categories of responsibility:

- • Tenant dependent.  Each tenant was responsible for evacuating their own customers and employees from their own tenant space.
- • Simon had their own common-area evacuation plan referenced in the SHARP Manual (SHARP Manual sent to OP 11.5.10/Simon Response to Plaintiffs 3rd RFP's – Bates 262).

As for an evacuation plan, IPC Tacoma Mall Security Director Erdie said, "Well, we established outdoor evacuation points for mall employees and customers so that each store could account for all their employees, things of that nature". (Erdie Deposition, Page 44:1-3)

Tacoma Mall Manager Steve Heim was asked, "And what about a shooting? (in reference to mall response and evacuation).  He answered, "Again, it would work the same type of a way.  I mean, if there's a reported shooting, you are not going to just run right into the situation.  That's unsafe for the officer and the other people involved, so you are going to go in and try to figure out what's going on, making sure that-- primarily that the customers are safe.  That's the primary responsibility, and then making sure that information is being relayed back to the police department so they can respond appropriately".  (Heim Deposition, 26:23 to 27:7)

Heim was then asked, "And how do you ensure that customers are safe, under the policy?"  He answered, "Basically it says to get them to safety, whether you need to barricade somebody behind a storefront, behind something that keeps them safe, or actually get them out of the mall to whatever safe area there happens to be or whether it's an evacuation process.  We have people that are stationed in areas so that we can effectively evacuate people from the mall".  (Heim Deposition, Page 27:11 to 27:19)

Another question posed to Heim, "What are the policies regarding a shooter in the mall?"  He answered, "They deal with-- they're together with acts of terrorism, hostage, and riots.  It basically says to notify the security manager immediately, and if directed, call 911, and depending on who is on the property at the time, will take the point... ".   The following questions was, "Who does it say will take the point?"  To which he answered, "It says general manager, security manager, maintenance supervisor, if you are on property.  If not, you would need to assign someone else".  (Heim Deposition, Page 32:6 to 32:15)

Heim was then asked, "Please continue about the evacuation procedures".  He said, "Should the evacuation be necessary, we would use the PA system.  The security managers ensure that all tenants are advised promptly of the evacuation order.  That's because our PA system doesn't go into tenant spaces.  The security manager forms security teams and monitors the evacuation

progress. The security team ensures that everyone vacates the building as safely and quickly as possible, assisting in and locating lost children, informing each tenant to close gates, secure store, and leave immediately, directs people to appropriate areas when exiting the building. The security team also ensures that everyone is off property and secures the building at the direction of the security manager. A security officer will control outside entrances to prevent unauthorized personnel from entering the building. Refuge areas, rally points are designated as the north overflow and south overflow parking lots. Store managers must account for their personnel". (Heim Deposition, Pages 34:7 to 35:2)

IPC Tacoma Mall Sergeant Bursott was asked, "Were you ever taught to evacuate people from the mall in any scenario?" She answered, "I want to say yes, when we did the earthquake training and stuff". Bursott deposition (Page 50:19 to 50:22)

Bursott was later asked, "Were you specifically trained on exits or evacuation routes at the Tacoma Mall?" She answered, "I know we were. I just -- I don't recall what was said and -- you know? But I know that we were trained on that stuff". (Bursott Deposition, Page 91:5 to 91:10)

IPC Tacoma Mall Security Officer Tacconelli was asked, "When you said that you were telling people to leave the mall, who were you saying that to?" She answered, "There were still some patrons. Some were looking for their (relatives), but primarily they were tenants that were standing at the front of their store wondering what they should do. The next question, "Were you Corporal Kim's supervisor at the time?" Tacconelli answered, "No. I was a PSO, I think, at the time". The following question was, "Did he tell you to head back to the east end or--." She answered, "He went to the east end. I went to the west end. It was a mutual decision. We said, "You go this way. I'll go this way." She was then asked, "What was that decision based on?" To which she answered, "Need. To clear the mall, evacuate". (Tacconelli Deposition, Pages 48:23 to 49:13)

Witness Martinez reported to police in his statement seeing "a couple of security guards...trying to get people out of there (evacuation)".

Plaintiff's Expert Wuorenma was asked, "As it actually turned out, on this occasion, once the shooting began, the patrons of the mall didn't have any difficulty figuring out where to go to get away from Mr. Maldonado, did they?" He answered, "From my information, no". (Wuorenma Deposition, Pages 161:22 to 162:1)

**RESPONSE**

As found in the provided IPC policies and procedures, "officers are not expected to investigate to the point of placing themselves in a dangerous situation at any time". "A Public Safety Officer should never confuse his role and function with that of a police officer, whose swore duty is to uphold the law". "A Public Safety Officer is not expected to expose himself to dangerous situations. Anytime an Officer perceives a threat to person or property, his first response will be to summon civil authorities, either police, fire, or ambulance. Handling serious civil disturbances is the sole responsibility of the police". (IPC Mall Public Safety Services Policies and Procedures Manual, Section VI, Page 2)

IPC Senior Executive Vice President, Donald Lantz was asked, "Do IPC policies mandate how a public safety officer would respond to a situation like Dominick Maldonado coming into the Tacoma Mall and shooting random people?" He answered, "Basically to observe; ultimately report; notify local law enforcement; notify the possible need of fire and EMS; management is notified, of course, and that's an administrative issue, but management is notified, all the way up to the chain of ownership is notified; and to be sure that if people start to leave the mall, they do it in, as best they can, somewhat in an orderly fashion, and I understand that may not be possible; if they decide to barricade themselves in tenant spaces, to assist that they can do that". (Lantz, Deposition, Pages 29:22 to 30:10)

Simon Vice President of Security, David Donaway was asked about security officer response. He said, "They are unarmed. They're not trained to go up against somebody that's armed. That's for the police to do, and they're the ones that are well-trained and well-equipped to do that. Their job at that point is to observe and report and, if possible, without getting in harm's way, if there's an evacuation or-- to clear out an area. When I say "evacuation," that doesn't mean you have to clear out the entire mall. Again, it just depends on the scope of the incident". (Donaway Deposition, Page 64:9-18)

We know from their depositions that Sgt. Bursott, Corporal Kim, and security officer Tacconelli responded towards the shooting to assist in customer evacuation, rendering aid to the injured, and assisted first responders as directed.

Tacoma Police Department Detective, Bradley Graham was asked, "As a police officer and a detective, how would you expect a mall security guard to respond in an incident like this?" He replied, "I would expect them to--I mean, I'm sure there has to be some sort of emergency procedure that they would follow, but I would want them to notify law enforcement, want them to

start directing people out of the mall, but beyond that-- if they're unarmed, I'd want them out of the way". He was then asked, "You would want them out of the mall? Detective Graham answered, "Out of the way, yeah. Then I would want them near the command posts so they could give me some guidance as to what we're looking at, schematics, that kind of stuff". He was then asked, "When you arrived at the mall, had it been evacuated?" Answer, "yes". (Graham Deposition, Pages 27:15 to 28:7)

IPC Tacoma Mall Security Director Erdie in his deposition was asked, "In your opinion, what was the appropriate protocol for your security employees to follow as soon as the shooting started?" He answered, "I think the employees went above and beyond the call of duty. For a young person who's totally unarmed to do anything other -- to do what they did was just amazing to me. I mean, human nature would say you'd want to go the other direction and, you know, be the first one to volunteer to go to the far end of the mall and start evacuating people. They didn't do that; they went towards the incident to try to help people. That was absolutely amazing in my opinion". (Erdie Deposition, Page 44:10 to 44:23)

On December 15, 2005, Corporal Kim received a Simon Team Service Commendation Award "in recognition of professional commitment and dedication for his actions taken during the shooting incident...". (*See* Danny Kim Employee file.)

**EMERGENCY COMMUNICATIONS**

The IPC Tacoma Mall Security Department had a dedicated Tacoma Police Department radio which they purchased with their own funds to be able to expedite calls for emergency help.

Both Simon (management, housekeeping, and maintenance) staff and IPC security officers were able to communicate on a single, two-way radio system throughout the mall proper.

The public address system had two control points. One at the publicly accessible Guest Services Counter and the second in the Simon management office.

IPC Tacoma Mall Security Sergeant Bursott was asked, "Do you remember there being a PA system?" She answered, "The only one was at Simon guest services, and they had the mall office employees that were there every day and they were the only ones that talked on that. The following question was, "Where was that located?". Bursott answered, "It was right in the middle of the mall. Like right across from Macy's..." (Bursott deposition 27:7-16)

In regard to the public address/music system having sufficient volume, we learned during the hostage-taking part of the incident that the Tacoma Police Department requested that mall security "turn the music off in the mall". (South Primary – Dispatch Transcription Tape, Page 8)

Witness Fortier in an interview with this expert stated that at closing, mall management would make an announcement over the public address system.  Fortier said that the announcement could be heard clearly in the entire retail area of the Kit's Camera store where he worked.

Security Officer Kim (supported witness Fortier) who stated in his deposition that he too has heard public address system at closing. (Kim Deposition, Page 81:19-20)

It was not the duty or job description of IPC Tacoma Mall Security to operate the public address system.  In the IPC Mall Public Safety Services Policies and Procedures Manual, Section 5, page 21, it states, "Based on information available, the General Manager or Operating Manger may decide to issue a warning to occupants of the Center via the public address system, emergency phone notification or by delivery of written notice to each tenant." Further, "In the event that center management, in cooperation with civil authorities, decides to evacuated the mall, Public Safety Officers should follow instructions carefully and avoid any actions or statements which might induce fear or panic among center occupants."  Lastly, "Officers should follow carefully any instructions issued by Center Management personnel". I could not find in the IPC Safety Services manual where IPC officers were required to make a public address system announcement.

It has been my experience that public address/music system sound typically does not carry into all tenant spaces of shopping centers or malls.  Not to say that an announcement could not be heard just inside of any given tenant doorway.  Tenants such as Sears, Macy's, Nordstrom, J.C. Penney, etc. generally prefer to have their own public address/music system.  Thus, the lease line between tenant space and the concourse is a significant contractual sound barrier for concourse music and public address system announcements.

Public address and music systems typically would not extend to or provide coverage for open or outdoor parking areas, walkways, sidewalks, driveways, or roadways.

Industry experts and interview subjects Marcello, Strother and Kavanagh all concur on both of the above statements regarding indoor and outdoor aspects of public address and music systems.

1    When looking at the aerial photograph of the mall proper below, it appears that the mall structure
2    encompasses approximately 30 percent of the entire property.
3



4
5
6    When taking into account the mall floor plan diagram below, it appears that the concourse,
7    hallways, public areas of the food court, and restrooms encompass approximately 20 percent of
8    the indoor public, non-tenant space where a public address/music system could be heard.



What this illustrates is perhaps less than 5% (estimated) of the entire property is covered by the public address system.  I have requested the specific square-foot figures of indoor public space and outdoor areas and will amend my report should they numbers provide any substantive change to the above estimate.

**OPINION:**  In the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack*, the authors did not encounter any active programs to evaluate what participating mall security entities derived from terrorism training, or if terrorism prevention and response was actually incorporated into daily work routines at locations assessed.

Similarly, they did not observe in the assessed malls any standards for evaluating whether their preparedness plans or their response to a simulated or real emergency were adequate.

However, while not necessarily complimentary of participating malls in this study, we do know that all four on-duty IPC Tacoma Mall security officers responded appropriately to a potentially dangerous, real-world incident in a professional manner.

IPC security officers had documented, requisite training and knowledge of the emergency evacuation plan.  Their response and subsequent actions were in line with published policies and procedures, assisting with medical aid and evacuation, and cooperating with first responders.

## Conclusions

In my report, I frequently reference the 2006 U.S. Department of Justice study entitled, *An Assessment of the Preparedness of Large Retail Malls to Prevent and Respond to Terrorist Attack.* My research showed this study to be the single, most descriptive third-party authoritative document showing what the industry was doing nationwide to secure large malls during the period on or about the date of this shooting incident.

We know that Maldonado was covert in his intentions.  Once initiated, the sequence of events that could have been influenced by any security action was so short in duration that it would have been unrealistic to expect IPC Tacoma Mall security officers could have prevented the incident.

When the shooting began, McKown was safely protected behind cover and concealment in the Kit's Camera store. He could have easily retreated to the back of the store, and exited away from the threat with the employees. McKown had no legal obligation or authority to act. In fact, he was not under any immediate duress until he himself made forward, aggressive-in-intent, movement exiting the store to confront Maldonado on the concourse.

I believe the shooting event was so short in duration that should a call have been made to 911, or if any Simon employee or IPC Tacoma Mall security officer had an opportunity to communicate by radio to guest services so they could have made a public address evacuation announcement, there would not have been sufficient time to make that announcement before the shooting ended. However, once the shooting had started, McKown had already decided that he was going to intervene and his destiny, whatever it would be, would be.

IPC Tacoma Mall security officers were not police officers, and we should not have that expectation. They were hired, trained, and supervised to reasonable standards and practices. And as noted in sections above, to a standard no less than equal to, or in many cases, to a higher than others in the industry.   Their sole duty was to be observed, assist the public, to observe activity, and report.

Any direct intervention or confrontation of Maldonado by the unarmed security officers would have been in violation of the IPC policies and procedures and put themselves in a potentially untenable and dangerous position.

I am not aware of any reasonable, 100% effective security solution for a public access shopping mall. Further, no security plan, no matter how detailed, is perfect. Nor can it guarantee safety in all circumstances.   In most public settings, it is very difficult to deter highly-motivated criminals like Maldonado.  Mall security operations are generally designed to deter potential crime by increasing the likelihood it will be discovered.  Maldonado concealed his intentions until such time that he chose the time and place to be discovered.

It is my opinion that IPC Tacoma Mall could not have foreseen this incident.  They deployed a reasonable security program in line with existing industry standard of care and implemented that plan in good faith.

1    Officers responded to the sound of gunfire in an admirable fashion, in accordance with their
2    policies and procedures.

3

4    Lastly, I would like to interject Maslow's *Hammer Theory* to my conclusion.  As American
5    Psychologist Abraham Maslow said in 1966, "*I suppose it is tempting, if the only tool you have is*
6    *a hammer, to treat everything as if it were a nail.*" Maslow's hammer theorizes on an over-reliance
7    of a familiar tool, the hammer.  All-too-often, critics find it is easy to pound every security measure
8    no matter how effective it proves to be.  I see that in this case.

9

10   When considering the totality of circumstances, I am not of the opinion that the effectiveness or
11   capacity of the IPC Tacoma Mall security program either led to, or contributed to McKown's
12   injuries.

13

14   Should any additional pertinent information become available regarding this case, please forward
15   it to my office so that it may be reviewed and my report amended, modified or supplemented
16   accordingly.

17

18   Respectfully prepared and submitted,

Trident Investigative Service, Inc.®



Michael J. Canaan, CPP CFLC
President

## APPENDIX 1 — Board Certifications

Attached are descriptions of my board certifications, current as of the date of this report.

## APPENDIX 2 — Curriculum Vitae

Attached is my Curriculum Vitae, current as of the date of this report.

## APPENDIX 3 — Expert Witness Cases

Attached is a listing of my expert witness cases, current as of the date of this report.

## APPENDIX 4 — Materials and Exhibits Reviewed

This report and exert opinion is based, in part, on my education, training and experience in the security and investigative fields. In addition, I have reviewed, consulted, and relied upon certain materials or exhibits, prepared or furnished by other individuals and sources. Due to the volume of materials reviewed, I have attached a separate spreadsheet listing those items.

## APPENDIX 5 — Photographic Index

| Photographs Taken by: | Michael J. Canaan |
|---|---|

| Date Photographs Taken: | Thursday, March 17, 2016 |
|---|---|

| Location of Photographs: | Simon Tacoma Mall, Tacoma, Washington |
|---|---|



| PHOTOGRAPH 01: | Lens Crafters hallway. The "Dasani" soda machine at the time of the incident was approximately 19 feet down the hallway. |



| PHOTOGRAPH 02: | Depicts a full-length view of the Lens Crafters hallway. |



| PHOTOGRAPH 03: | View from the Lens Crafters hallway to the Sprint (then T-Mobile) kiosk. |
|---|---|



| PHOTOGRAPH 04: | Westerly view from behind the then T-Mobile kiosk towards the Gymboree (Kit's Camera) and Vans (Sam Goody) stores. |
|---|---|



**PHOTOGRAPH 05:** Westerly view from in front of the then T-Mobile kiosk towards the Gymboree (Kit's Camera) and Vans (Sam Goody) stores.



**PHOTOGRAPH 06:** Closer view of the Gymboree (Kit's Camera) and Vans (Sam Goody) stores.



**PHOTOGRAPH 07:**   The Gymboree store was formerly the Kit's Camera store.



**PHOTOGRAPH 08:**   Depicts the Vans store.  Formerly the Sam Goody store.



| PHOTOGRAPH 09: | Easterly view from the Vans (Sam Goody) and Gymboree (Kit's Camera) stores. |



| PHOTOGRAPH 10: | Easterly view from the front of the Vans (Sam Goody) store. The males pictured near the center of the photo are standing approximately where the shooting started. |

## APPENDIX 6 — Glossary of Industry Terms and Definitions

*The following definitions are provided for the lay person to better understand industry and legal terms used herein. The definitions were obtained all or in part from a variety of industry and legal sources.*

**ACTIVE SHOOTER / ACTIVE KILLER.** First crafted shortly after the 1999 Columbine massacre, the agreed-upon definition of an active shooter by U.S. government agencies—including the White House, U.S. Department of Justice/FBI, U.S. Department of Education, and U.S. Department of Homeland Security/Federal Emergency Management Agency—is "an individual actively engaged in killing or attempting to kill people in a confined and populated area."

**ADEQUATE.** Enough for some need or requirement. Good enough. Of a quality that is good or acceptable; but not better than acceptable. Sufficient to satisfy a requirement or meet a need; equal to what is required; suitable to the case or occasion. Having the requisite qualities or resources to meet a task.

**ARREST / APPREHEND.** Seize someone by legal authority and take into custody. A seizure or forcible restraint; an exercise of the power to deprive a person of his or her liberty; the taking or keeping of a person in custody by legal authority.

**ASSESSMENT – *RISK ASSESSMENT*** is the process of identifying variables that have the potential to negatively impact an organization's ability to conduct business. *Risk is exposed at the intersection of assets, threats, and vulnerabilities.* The identification, evaluation, and estimation of the levels of risks involved in a situation, their comparison against benchmarks or standards, and determination of an acceptable level of risk. A risk assessment can be quantitative or a qualitative. In a quantitative risk assessment, one assigns numerical values to the probability an event will occur and the impact it will have. These numerical values can then be used to calculate an event's risk factor, which in turn can be mapped to dollar amounts. Qualitative risk assessments, which are used more often, do not involve numerical probabilities or predictions of loss. The goal of a qualitative approach is simply to rank which risks pose the most danger.

**ASSESSMENT – *SECURITY VULNERABILITY ASSESSMENT (SVA)*** includes a risk assessment and threat assessment, as well as other components that may be added to do a complete assessment of the vulnerabilities. *A vulnerability is a weakness or gap in protection*

1   *efforts.* The results of the SVA are used in developing countermeasures to address adversarial
2   events.
3
4   **ASSESSMENT – *THREAT ASSESSMENT*** is a structured group process used to evaluate the
5   risk posed by a person or activity, typically as a response to an actual or perceived **threat** or
6   concerning behavior. *We strive to protect ourselves against threats.* A threat assessment
7   comprises strategies used to determine the credibility and seriousness of a potential threat, as
8   well as the likelihood that it will be carried out in the future.
9
10  **BACKGROUND / PRE-EMPLOYMENT SCREENING** is the process of authenticating the
11  information supplied to a potential employer by a job applicant in his or her resume, application,
12  and interviews. In most application processes, lying about background and credentials will keep
13  the employer from hiring the applicant. Background checking ensures the employer that the
14  candidate has the background and experience he or she claims and may be conducted as a way
15  to further differentiate potential employees and pick the one the employer feels is best suited for
16  the position. Employers have an obligation to make sure their work environment is safe for all
17  employees and help prevent other employment problems in the workplace. Many employers
18  choose to search the most common records such as criminal records, driving records, and
19  education verification. Other searches such as sex offender registry, credential verification, skills
20  assessment, reference checks, credit reports and Patriot Act searches are becoming increasingly
21  common.
22
23  **BEST PRACTICE** is the recognized methods of correctly running businesses or providing
24  services within a specific industry. A best practice is a method or technique that has consistently
25  shown superior results to those achieved by other means, and that is used as a benchmark.
26
27  **CERTIFICATION** is the act of granting credit or recognition (especially with respect to educational
28  institutions that maintains suitable standards). One of the most common types of certification in
29  modern society is *professional* certification, where a person is certified as being able to
30  competently complete a job or task, usually by the passing of an examination and/or the
31  completion of a program of study. Some professional certifications also require that one obtain
32  work experience in a related field before the certification can be awarded. Some professional
33  certifications are valid for a lifetime upon completing all certification requirements. Others expire
34  after a certain period of time and have to be maintained with further education and/or testing.
35
36

**COMPETENCY** is the quality of being adequately or well qualified physically and intellectually. The quality of having great facility and competence.

**FORENSIC.** The use of knowledge and techniques in the investigation of an event; a method of gathering and examining information; to develop something that is usable in court.

**FORESEABILITY** in the law of Negligence, is to perceive, know in advance, or to reasonably anticipate that damage or injury will occur from one's acts or omissions.

**INVESTIGATION** is a careful examination or search in order to discover facts or gain information. The work of inquiring into something thoroughly and systematically.

**LIABILITY** means legal responsibility for one's acts or omissions.  Failure of a person or entity to meet a responsibility leaves him/her/it open to a lawsuit for any resulting damages.  In order to win a lawsuit, the suing party (plaintiff) must prove the legal liability (negligence) of the defendant if the plaintiff's allegations are shown to be true. *See* the four elements of negligence below.

**MASS SHOOTING** refers to an incident involving multiple victims of gun violence.  *The Congressional Research Service* acknowledges that there is not a broadly accepted definition and uses a definition of a "public mass shooting if 4 or more people are actually killed, not including the perpetrator, echoing the *FBI* definition of the term "mass murder". Another unofficial definition of a mass shooting is an event involving the shooting (not necessarily resulting in death) of four or more people with no cooling off period.

**NEGLIGENT / NEGLIGENCE** is a result where someone is careless in not fulfilling a responsibility; not necessarily intentional harm. Conduct that falls below the standards of behavior established by law for the protection of others against unreasonable risk of harm. A person has acted negligently if they departed from the conduct expected of a reasonably prudent person acting under similar circumstances for failing to take proper or normal care of something or someone.  Types of negligence are:

1. *Gross Negligence* is a conscious and voluntary disregard to use reasonable care, which is likely to cause foreseeable grave injury or harm.
2. *Ordinary Negligence* is a mere failure to exercise reasonable care.
3. *Contributory Negligence* is a lack of care by the plaintiff that may combine the defendants' conduct to cause the plaintiff's injury. The concept of contributory negligence

is used to characterize conduct that creates an unreasonable risk to one's self. The idea is that an individual has a duty to act as a reasonable person. When a person does not act this way and injury occurs, that person may be held entirely or partially responsible for the resulting injury, even though another party was involved in the incident.

4. **Comparative *Negligence*** is wherein each party's negligence for a given injury is weighed when determining damages. Traditionally, the courts viewed *contributory negligence* as a total bar to the recovery of any damages. That is, if a person had contributed to the accident in any way, the person was not entitled to compensation for his or her injuries. In an attempt to reduce the harsh, oftentimes unfair outcomes resulting from this approach, most states have now adopted a *comparative negligence* approach.

5. *Vicarious Liability* is a form of negligence where the defendant is held responsible of the actions of another person or animal. Vicarious Liability can also be used when an employer fails to properly oversee their employees, and is thus held responsible for their employee's actions.

6. *Strict Liability* is the absolute legal responsibility for an injury that can be imposed on the wrongdoer without proof of carelessness or fault. Strict liability, sometimes called absolute liability, is the legal responsibility for damages, or injury, even if the person found strictly liable was not at fault or negligent.

### *The four elements of negligence are:*

1. Duty to care or protect.
2. Failing to act or exercise a reasonable standard of care.
3. Proximate cause or actual injury.
4. Proving monetary loss and damages.

A **POLICY** is a principle or rule to guide decisions and achieve rational outcomes. The policy outlines security roles and responsibilities, defines the scope of information to be protected, and provides a high level description of the controls that must be in place to protect information. In addition, it should make references to the standards and guidelines that support it.

**PROCEDURES** are step-by-step instructions to assist workers in implementing the various policies, standards and guidelines. While the policies, standards and guidelines consist of the controls that should be in place, a procedure gets down to specifics, explaining how to implement these controls in a step by step fashion.

A **PROFESSIONAL** is a person engaging in a given activity as a source of livelihood or as a career whose job requires special education, training, or skill; a skilled practitioner who engages in an activity with great competence.  An expert who is characterized by or conforming to the technical or ethical standards of a profession.  Someone who does a job that requires special training, education, or skill who is a member of a profession.

**PROXIMATE CAUSE** is an event sufficiently related to a legally recognizable injury to be held as the cause of that injury.

**RECKLESS.**   Acting or done with an intentional lack of care or proper caution; careless or irresponsible; careless to the point of being heedless of the consequences.

**SECURITY** may be defined as the state of being reasonably protected from foreseeable danger, injury, or loss.

A **SECURITY OFFICER** is a private person who is paid to protect an organization's assets from various hazards by utilizing preventative measures. They do this by maintaining a high-visibility presence to deter illegal and inappropriate actions, observing for signs of crime, fire or disorder; then taking action to minimize damage and reporting any incidents to their client and law enforcement as appropriate.

A **SECURITY PLAN** could be a comprehensive system of security hardware, policies, and procedures designed to aid in the anticipation, recognition, and prevention of foreseeable crime.

A **STANDARD** in this context is a document that provides requirements, specifications, guidelines ethics, habits, or processes established by a professional accredited authority or legal entity as acceptable to be used to ensure that materials, products, processes, procedures and services are safe, reliable, safe, and consistently fit for their purpose.

**STANDARD – *DUTY OR STANDARD OF CARE*** is a legal obligation which is imposed on an individual or entity requiring adherence to a standard of reasonable care while performing any acts that could foreseeably harm others. It is the first element that must be established to proceed with an action in negligence where the claimant must be able to show a duty of care which the defendant has breached.

1    Duty of care may be considered a formalization of the social contract, the implicit responsibilities
2    held by individuals towards others within society. Once a duty exists, the plaintiff must show that
3    the defendant breached it. This is generally treated as the second element of negligence. Breach
4    involves testing the defendant's actions against the standard of a *reasonable person*, which varies
5    depending on the facts of the case.

6    However, it is possible that the defendant took every possible or reasonable precaution and
7    *exceeded* what would have been done by any reasonable person or entity, yet the plaintiff was
8    injured. If that is the case, then as a matter of law, the duty of care has not been breached and
9    the plaintiff cannot recover in negligence.  This is the key difference between negligence and strict
10    liability; if strict liability attaches to the defendant's conduct, then the plaintiff can recover under
11    that theory regardless of whatever precautions were taken by the defendant.

12

13    **SUPERVISE / SUPERVISION.**  To actively manage, watch and direct; be in charge of.  To lead,
14    command, control, oversee, regulate, and administer.  Management by overseeing the
15    performance or operation of a person or group, or authoritative control over the affairs of others.

16

17    **TERRORISM,** in its broadest sense, is defined as the use of violence, or threatened use of
18    violence, in order to achieve a <u>political, religious, or ideological aim</u>.

19

20    **TRAINING** is an act, method, or process of instruction; to teach so as to make fit, qualified, or
21    proficient.