1

2

3

4

5

6

7

8

9

10

THE HON. BENJAMIN H. SETTLE

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BRENDAN MCKOWN,

                          Plaintiff,

    vs.

SIMON PROPERTY GROUP, INC., dba
TACOMA MALL, a Delaware corporation; and
IPC INTERNATIONAL CORPORATION, an
Illinois corporation,

                          Defendants.

No. 3:08-CV-05754-BHS

**PLAINTIFF'S TRIAL BRIEF**

PLAINTIFF'S TRIAL BRIEF

No. 3:08-CV-05754-BHS



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

## I.    INTRODUCTION

Plaintiff Brendan McKown brings this lawsuit against an owner of the Tacoma Mall, Simon Property Group, Inc. ("Simon"), and the security firm that was contracted to provide security services for the mall on Simon's behalf, IPC International Corporation ("IPC"), for the injuries he sustained on November 20, 2005, when Dominick Maldonado entered the Tacoma Mall and shot McKown along with six other mall patrons.

Plaintiff thanks the Court for its work on this matter and looks forward to a spirited presentation of the case.

Plaintiff reserves the right to supplement this brief as he continues to review the Court's order granting in part and denying in part Defendants' motions for summary judgment.

## II.    FACTUAL BACKGROUND

The Court is acquainted with the basic factual outline of events but, for purposes of evaluating some of the liability and damages issues, the following facts should prove useful.

### A.    The November 20, 2005 Shooting at the Tacoma Mall

1.    Maldonado's Suspicious Activity Prior to the Shooting

On November 20, 2005, Simon's entire four-person security staff at the Tacoma Mall was congregated in their outdoor security office, located in a separate building. Three of the four were on duty and one was off-duty. Despite it being the Sunday prior to the Thanksgiving holiday, there were no security officers actually patrolling the inside of the mall area.

At approximately 11:30 a.m. that day, a man named Dominick Maldonado arrived at the food court of the mall wearing a black trench coat and carrying a guitar case. Underneath the trench coat and inside the guitar case were an assault rifle, a semi-automatic pistol, and a substantial amount of ammunition. Christopher Winters, a mall patron, immediately noticed Maldonado as he entered. According to Winters, Maldonado had a strange emotionless look on his face that made him appear "out of place." When Maldonado passed Winters, Winters felt uneasy and had "an odd feeling on the back of [his] neck." Winters stopped and watched Maldonado circle around the food court "glassing the crowd" before walking towards the main

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

hallway.

Not surprisingly, because of Maldonado strange dress and unusual behavior, several other witnesses recalled seeing Maldonado that morning, each of them noting the many ways in which Maldonado stood out to him or her. One witness, for example, described how Maldonado would "bump into other shoppers" as "he was walking really fast" through the mall corridors, like "he was in a bad mood." Later, Maldonado admitted he had gone to a bathroom near the food court and made a bunch of noise, "want[ing] someone to stop [him]."

Despite this being lunchtime the Sunday prior to the largest shopping holiday of the year, Simon did not have a single security guard anywhere within its 1.3 million square foot property, let alone the food court, which is where Simon usually required extra coverage and where Maldonado began accosting Simon's patrons. Simon and their guards did not monitor Maldonado's actions remotely either, for the 40 minutes he was acting strangely, because the mall did not have any sort of surveillance system. Instead, after openly harassing Simon's guests without any intervention by either Simon or its security contractor IPC, Maldonado went into a vacant hallway – the same vacant hallway the Mall knew required extra vigilance and attention – and for the next ten minutes he openly loaded his two weapons while smoking a cigarette. After he finished loading his firearms, Maldonado left the vacant hallway and began shooting.

   2.   <u>Simon Did Nothing as Maldonado Unleashed His Attack on Its Invitees</u>

For the next eight minutes, Maldonado walked through the Tacoma Mall shooting people who did not know where the shots were coming from, did not know how to evacuate, or stayed in the mall to try to help others. One of those people was Plaintiff Brendan McKown. McKown and others took refuge in one of the mall stores. He could hear the shooter firing his weapon as the shooter marched up and down the mall, but McKown did not know where the man was or whether anyone was trying to stop him. Nobody told McKown or the others trapped inside the mall what was happening, nobody warned them where the shooter was located,

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

nobody instructed them how to evacuate, and nobody told them whether the police were there or whether the police were on their way.

Surrounded by chaos, McKown hoped he could at least protect himself and others with his concealed weapon.  When the shots paused, McKown thought the coast was clear.  He holstered his weapon so he could survey the area outside the store without being shot by the police that he assumed were in the mall and had the situation under control.  Unfortunately, Maldonado was still active.  When McKown started to leave, he came face-to-face with Maldonado and became his last victim.

Maldonado shot McKown five times at close range with his assault rifle. Two of the bullets struck McKown directly in the abdomen ultimately traveling to and hitting his spinal column.  After two hours of delayed transport to the hospital because of the shooting, McKown underwent an exploratory laparotomy and an L3-4 laminectomy and debridement and removal of bone and bullet fragments. As a result of the shooting, McKown was paralyzed down his left side and now lives the majority of his life confined to a wheelchair.

**B.      Simon was Aware of the Threats and Vulnerabilities of Its Retail Properties, Including at the Tacoma Mall, Well Before the November 2005 Shooting**

Despite its assertions to the contrary, Defendant Simon was well aware before November 2005 that its retail properties were at significant risk of being attacked by an active shooter and/or another terrorist threat. Not only had active shooters opened fire in multiple malls owned and operated by Simon before 2005, but many of Simon's policies, protocols and materials that it designed and implemented for a variety of its mall locations provide clear and irrefutable evidence that Simon viewed mall shootings as a foreseeable event. Simon's 2003 pre-packaged media response for mall representatives to deliver whenever a shooting occurred on one of its properties, is a prime example:

**Confidential- For Internal Use Only**
**SHOOTING/GANG**
**MEDIA HOLDING STATEMENT**

*The following statement is for holding purposes only. It should only be delivered*

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

*verbally in response to any media inquiries that you may receive regarding the recent shooting on mall property.*

Our primary concern is always for the safety of our shoppers and mall employees, and we wish the individual a full and speedy recovery.

Since this incident is currently under police investigation, I cannot provide you with any details at this time. What I can tell you is that we are committed to providing a safe, quality shopping environment.

To do this, we take several proactive security measures that include maintaining a close relationship with the Aurora Police Department and continuous security patrols of our mall and surrounding parking lots. We also provide our shoppers and mall employees the opportunity to obtain a security escort to their vehicles as part of our "At Your Service" program.

For further information regarding this incident, I ask that you please contact [insert police officer] of the [department name] Police Department. He/She can be reached at [insert phone number].

*          *          *

We are committed to providing a safe, quality shopping environment for all of our shoppers and mall employees. To deliver on this commitment, we take several proactive steps that include:

- Maintaining a close relationship with the [department name] Police Department

- Continuous security patrols of our mall and surrounding parking lots

- Enforcing a code of conduct, such as no loitering, posted at each of our mall entrances, to ensure that our shoppers receive a safe, quality shopping experience.

At the Tacoma Mall, as of November 20, 2005, Simon failed to implement and/or execute many of those same policies and protocols it knew were necessary to ensure patron safety. As a result, Brendan McKown's life was altered forever.

1.     Mall of America

Prior to 2005, one of the malls Simon long owned and operated was the Mall of America ("MOA") in Minnesota. According to the former Security Director of MOA, Gregory Henricks, MOA utilized active shooter protocols during his tenure at the mall, in addition to a variety of other security measures designed to increase mall safety.[1] These active shooter protocols, which

---

[1] In addition to the active shooter protocols, Simon implemented numerous other preventative safety measures at MOA to better protect its patrons: (1) security officers; (2) security patrols; (3) surveillance; (4) internal SWAT

PFAU COCHRAN
VERTETIS AMALA
*A Professional Limited Liability Company*

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

Simon knew were designed to keep mall patrons safe, were implemented well before the November 2005 Tacoma Mall shooting. In fact, Simon Property Group first started to prepare for active shooter threats before September 2001, before the 9/11 terrorist attacks, because of a "tip" that MOA management had received informing them that the mall was at risk of being targeted. In response to this "tip", Simon's MOA drew up plans to counteract terror attacks on the mall – these plans included purchasing a new radio communication system, upgrading fiber optics and the CCTV cameras, and replacing cameras with a digital recording system for video and radio recording. Simon's MOA also redesigned its security center and installed new display panels for live monitoring and a computer aided dispatch so that any and all incidents were properly documented.

Following the 9/11 terrorist attacks, after terrorism became a recognized threat for all American citizens, Simon knew that very serious security measures were needed to adequately protect their business invitees. In regard to active shooters at MOA, Henricks was concerned that an attacker could come into the mall and open fire at any time. In an attempt to counter that threat, as well as to reduce other safety concerns, Simon contacted a variety of security firms requesting that risk assessment evaluations be completed to see what additional measures were needed at the mall.

Chameleon Associates, a Los Angeles security firm, was one of the groups contacted by Simon and MOA in 2004 to conduct such an assessment. Chameleon conducted an overall security enhancement program at MOA that entailed running a "red team exercise and survey" to identify security risks that MOA was facing. In the report that Chameleon generated for Simon and MOA, Chameleon specifically noted that MOA's security unit needed to be prepared for an active shooter bringing a gun into the mall, assembling the weapon, and firing at people in the area.

---

team; (5) intercom system; (6) verbal judo training; (7) the Mighty Moms and Dedicated Dads Program; (8) curfew on weekends; (9) parental escort policy; (10) CCTV system; (11) a Bloomington Police Station located onsite; (12) contracting off duty police officers to perform patrols; (13) badging system; (14) intercom system; (15) regular drills with police department.

PLAINTIFF'S TRIAL BRIEF

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

Near or around 2004, because of the security risks and threats raised in the risk assessments from the security firms like Chameleon, Simon and MOA began to investigate instituting a behavioral profiling program that was focused on mitigating the threat of active shooters and other terrorist acts. The program, which MOA eventually referred to as RAM, involved RAM officers actively screening people that displayed suspicious indicators. Officers were trained to conduct conversations or security interviews with individuals at the mall, classify individuals as potential threats, and apply proper mitigation protocols.

2.    The Aurora/Town Center Mall

On June 21, 2005, approximately five months before the mall shooting in Tacoma, a Simon Property Group mall located in Aurora, Colorado (the Aurora Mall), had an active shooter enter the mall and open fire; an individual entered the mall with a handgun and shot three people, killing one.

Laurie Ann VanDalen, one of Simon's 30(b)(6) representatives, was employed as the Assistant Mall Manager for the Aurora Mall at the time of the shooting. She testified that, on the day of the shooting, approximately 5-7 security officers were deployed within the mall.[2] Those officers were assigned to walk and patrol different routes, both on the interior and exterior, and were responsible for staying alert for any type of behavior that was out of the ordinary, disorderly or disturbing to other mall patrons.  In addition to the security officers, the Aurora Mall also hired off-duty police officers to patrol in and around the facility. According to VanDalen, the mall utilized a dress code and had CCTV cameras installed throughout the mall.

VanDalen also testified that on the day of the shooting, the Aurora Mall had security procedures in place to protect patrons from mall shootings. Before the June 2005 shooting, the active shooter protocols in place at Aurora involved security officers and the off-duty police officers moving people away from the sound of gunfire and either having them evacuate or find

---

[2] The Aurora Mall is approximately 1,081,000 sq. ft. in size, approximately 200,000 sq. ft. smaller than the Tacoma Mall.

PLAINTIFF'S TRIAL BRIEF

PCVA PFAU COCHRAN VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

shelter in place.

Because of the security measures that Aurora Mall had implemented on June 20, 2005, after the first few shots rang out, an off-duty police officer assigned to his patrol route nearby noticed the alleged gunmen and a chase ensued. While in pursuit, he radioed for help and the other mall security officers and off-duty police officers assigned to the mall that day secured the mall during the chase. Ultimately, the police officer was able to capture the shooter just outside the mall.

The rapid response protected mall patrons, limiting the number of shooting victims. The active shooter tragedy at the Aurora Mall confronted Simon with the reality that its security measures *still* needed to be improved upon in order to adequately protect its patrons from mall shootings in the future:

> **Q.**   (COLE DOUGLAS) After the shooting on June 21st, 2005, policies and procedures were changed to prevent another shooting from occurring, correct?
>
> *            *            *
>
> **A.**   (LAURIE VANDALEN) Yes.

To protect patrons from another shooting, Simon made changes to the security staff, increasing the sheer number of security officers in the mall at any one time, and also increasing the number of armed police officers onsite (this included building a police substation at the mall).

In addition, Simon installed additional security cameras and purchased two new security vehicles to patrol outside. Simon also implemented a series of changes designed to provide a safe and pleasant shopping environment for its shoppers:

> **Q.**   Were all of the increased security measures done in an effort to protect mall patrons and mall employees?
>
> **A.**   Yes.
>
> *            *            *
>
> **Q.**   Did the Aurora Mall include those additional security measures to ensure that its shoppers and employees were safe?
>
> **A.**   Yes.

PLAINTIFF'S TRIAL BRIEF



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

3.      Other Simon Property Group Malls

In addition to the MOA and the Aurora Mall, several other malls owned and operated by Simon Property Group back in 2005 utilized active shooter protocols and/or emergency response plans during the same time frame as the Tacoma Mall shooting: (1) the Galleria Mall, in Houston, Texas; (2) the Fashion Centre at Pentagon City, in Arlington, Virginia; (3) the Westchester Mall, in White Plains, New York; and (4) the Mall at Rockingham Park, in Salem, New Hampshire.

Each of these Simon-owned properties implemented Emergency Response Plans that its employees and security teams were required to follow in the event of a crisis like an active shooting and each property also implemented an Emergency Evacuation Plan tailored to the property to ensure that tenants and patrons knew how to protect themselves and others in the midst of an emergent situation. These plans were also in compliance with Simon's "S.H.A.R.P." plan, which provides guidance on terrorist threats based on U.S. Department of Homeland Security Guidelines.

In addition to the Emergency Response Plans and Emergency Evacuation Plans, the Simon-owned malls identified above, also utilized additional security measures to protect patrons from reasonably foreseeable events like mall shootings. Each of the properties had CCTV cameras installed throughout – these cameras were monitored daily and around the clock. All of the malls had regular contact with local law enforcement and required security officers to participate in regular trainings and drills. The Galleria Mall and the Mall at Rockingham Park even implemented a badging/identification system for tenants and deliveries.

Moreover, in addition to implementing response plans for emergent situations like mall shootings and other terrorist attacks, its appears as if Simon also entered into an indemnity agreement with a third party to insulate itself from liability if an active shooter ever came on to one of its properties and opened fire on mall patrons. Unfortunately, the details surrounding Simon Property Group's active shooter indemnity agreement are not fully known by Plaintiff

PLAINTIFF'S TRIAL BRIEF

Page 8 | No. 3:08-CV-05754-BHS

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

at this time, but the "missing" active shooter indemnity agreement file has been requested for production on multiple occasions and the reason for why it still has not been produced is at the heart of Plaintiff's most recently filed motion to compel, currently pending before this Court.

      4.   <u>The Tacoma Mall</u>

      In 2005, Simon also owned the Tacoma Mall in Tacoma, Washington.  In September 1999, Simon and IPC entered into a "Security Services Contract" to provide security at the Tacoma Mall. In January 2003, Simon and IPC renewed that contract.  The following year, they amended their contract to ensure Simon was an additional insured on IPC's insurance policies. The contract between Simon and IPC required IPC to (1) respond to all alarm conditions and any other indications of suspicious activities, (2) use reasonable efforts to deter and detain persons who were attempting to gain unauthorized access to the mall, (3) respond to and provide assistance in security-related situations at the mall, including criminal acts, and (4) patrol the "common areas" of the Mall, which included the food court and hallways.  The director of mall security Richard Erdie testified his responsibility was "to provide a safe place for people to come and shop."

      The same security director also admitted he had "lots of discussions" with Simon and IPC about how the mall was a "soft target" that might be the subject of a terrorist attack.  Simon and IPC were sufficiently concerned about the possibility of an attack that they adopted new policies and procedures, including evacuation points for mall employees and customers. Simon's internal documents also acknowledged that "recent terrorist attacks" made it aware of the danger that a vacant hallway might be used to prepare for an assault on its invitees.  For example, in 2003 and 2004, Simon's mall manager warned his tenants to keep a look-out for "anyone suspicious in the back hallways" and to "notify mall security … right away" because "[w]e all play an equal part in keeping the mall safe for our employees and customers."

      In addition to the threats of terrorist attacks, IPC was also providing a variety of basic training to its security officers.  This training not only included lessons on terrorism, but also

PLAINTIFF'S TRIAL BRIEF



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

included training on how to identify "suspicious people."

IPC also trained their officers on "Patrol Strategies and Techniques," enabling them to utilize "Crime Prevention Through Environmental Design," which "is a concept of looking at our surroundings to see how we can use our environment to help prevent crime.  Essentially, the CPTED concept just gives us a formal, more scientific method of observing our surroundings and identifying situations that should be addressed to avoid potential problems." The same training emphasized "**ATTENTIVE OBSERVATION IS THE KEY**," "**[t]he key to a good patrol is observation!!,**" and a "proactive patrol philosophy" that is "always on the lookout for potential problems" so problems can be addressed "before they develop":

> In Basic Training, we first introduced you to the idea of a "**Professional Patrol.**" This is the proactive patrol philosophy of IPC International.  It means that we patrol in an active and alert manner, looking to identify and prevent trouble from occurring through attentive observation and immediate and appropriate response.  We are always on the lookout for potential problems involving customers, employees, tenants and the physical condition of the building and its surroundings.  By identifying potential problems and responding appropriately to them <u>before</u> they develop, we achieve a professional and effective patrol.

On November 5, 2005, just fifteen days before Dominick Maldonado entered the Tacoma Mall in a Columbine-like trench coat with an Intratec Tec-9 and a massive, Mak-90 assault rifle, while holding a guitar case full of ammunition, IPC's security director for the Tacoma Mall, Richard Erdie, wrote a memorandum to defendant Simon Property Group's mall manager, Steve Heim, and to defendant IPC's regional security manager, Kirk Barnett.  In his internal memorandum, Mr. Erdie reminded his superiors of the long history of violence at the Tacoma Mall and described the various security measures he was pressing Simon and IPC to implement to avoid future violence.  He went so far as to point-out that a sub-station for the Tacoma Police that had been housed on the property had been vacant since 2004.

Despite Simon's knowledge of the risk of active shooter/terrorist-type attacks on shopping centers, and the Tacoma Mall's history of attempting to prevent violent crimes from occurring on its property, the security measures in place at the 1.3 million square foot Tacoma Mall on November 20, 2005 consisted of (1) **four security guards** (no more than one guard for

PLAINTIFF'S TRIAL BRIEF



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

over 325,000 square feet), who were often on break or performing housekeeping and maintenance chores, and (2) **an inaudible intercom system that no one knew how to operate and that was inaccessible to mall security on the weekends**. The mall had no surveillance system or closed-circuit television (CCTV) to view any of the common areas remotely. Simon's leadership did not take the position in this case that it was unable to install CCTV, but that Simon was waiting for "technology advancements" such as "face recognition" technology prior to installing CCTV.

## C.     Procedural History

In 2010, Simon and IPC moved for summary judgment and asserted the shooting was not foreseeable as a matter of law because there had never been a prior shooting inside the Tacoma Mall. McKown argued that a shooting was foreseeable based on prior shootings at other "soft targets," and argued the defendants should have had a working surveillance system and intercom system to either prevent the shooting or to help safely evacuate McKown and their other invitees once the shooting started.

This Court initially denied Simon's motion, concluding that "the evidence raised a genuine issue of material fact as to whether the shooter's criminal conduct was reasonably foreseeable." However, Simon timely filed a motion for reconsideration and relied on a number of lower Washington appellate court decisions to assert that it could *only* be held liable if McKown provided evidence of prior similar acts on the premises. Based on Simon's assertion that such evidence was required, the Court granted Simon's motion for reconsideration and concluded that because "McKown has failed to submit competent evidence of random acts of indiscriminate shootings on Simon's premises," "the Court should grant Simon's motion for summary judgment on McKown's negligence claims."

McKown appealed to the Ninth Circuit, which certified the following questions to the Washington State Supreme Court:

1) Does Washington adopt RESTATEMENT (SECOND) OF TORTS § 344 (1965),



including comments d and f, as controlling law?

2) To create a genuine issue of material fact as to the foreseeability of the harm resulting from a third party's criminal act when the defendant did not know of the dangerous propensities of the individual responsible for the criminal act, must a plaintiff show previous acts of similar violence on the premises, or can the plaintiff establish reasonably foreseeable harm through other evidence?

3) If proof of previous acts of similar violence is required, what are the characteristics which determine whether the previous acts are indeed similar?

In answering the first certified question, the Court acknowledged the "general rule" is that a landowner owes "no duty to protect others from the criminal acts of third parties." However, the Court observed that RESTATEMENT (SECOND) OF TORTS § 344 (1965) provides an exception to that general rule and imposes a duty on businesses to protect invitees "from imminent criminal harm and reasonably foreseeable criminal conduct by third persons." *McKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d 752, 764, 344 P.3d 661, 665 (2015). Accordingly, the Court answered "yes" to the first certified question because "Restatement (Second) of Torts section 344 is generally consistent with Washington law" and "comments d and f generally describe the contours of the duty owed."

The second certified question for the Court's analysis was the most important for McKown and other victims of criminal conduct: if Washington has adopted RESTATEMENT (SECOND) OF TORTS § 344, is a plaintiff still required to show "prior similar acts on the premises" to prove reasonable foreseeability, or can the plaintiff prove foreseeability with other evidence? The Washington Supreme Court sided with McKown and affirmatively rejected the bright line test advocated by Simon that would require McKown to show prior similar acts on the premises: "Proving acts of similar violence is not the only way for a plaintiff to establish a duty as provided in the *Restatement.*" Thus, a plaintiff may present "'other evidence' on which a landowner's duty might be based," and such evidence may be derived from RESTATEMENT (SECOND) OF TORTS § 344 cmts d and f.

PFAU COCHRAN VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### III.   LIABILITY AND CAUSATION

The State Supreme Court made clear that evidence of "prior similar acts on the premises" is not required.  The Court also stopped short of taking a position on what other types of evidence can be relied upon to prove a crime is reasonably foreseeable because "the Ninth Circuit did not ask for a framework for evaluating 'other evidence' on which the landowner's duty might be based."[3]

The Washington Supreme Court affirmed that Simon owed McKown a duty to protect him from "imminent criminal harm and reasonably foreseeable criminal conduct by third persons."[4]  The Court observed that RESTATEMENT (SECOND) OF TORTS § 344 of imposes a duty on businesses to protect invitees and that "comments d and f [to section 344] generally describe the contours of the duty owed:"[5]

> *d. Reasonable care.* A public utility or other possessor of land who holds it open to the public for entry for his business purposes is not an insurer of the safety of such visitors against the acts of third persons, or the acts of animals. He is, however, under a duty to exercise reasonable care to give them protection. In many cases a warning is sufficient care if the possessor reasonably believes that it will be enough to enable the visitor to avoid the harm, or protect himself against it. There are, however, many situations in which the possessor cannot reasonably assume that a warning will be sufficient. He is then required to exercise reasonable care to use such means of protection as are available, or to provide such means in advance because of the likelihood that third persons, or animals, may conduct themselves in a manner which will endanger the safety of the visitor.
>
> *f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

The Washington State Supreme Court further described that "comment f, like section

---

[3] *McKown*, 182 Wn.2d at 761.

[4] *Id*. at 765, n.3 (citing *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 205, 943 P.2d 286 (1997)).

[5] *Id*. at 764.

PLAINTIFF'S TRIAL BRIEF



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799 Facsimile: (253) 627-0654

344 itself, contemplates two kinds of situations that may give rise to a duty." The first situation is "where the landowner knows or has reason to know of immediate or imminent harm." The second situation "is where the possessor of land knows, or has reason to know, based on the *landowner's past experience*, the *place* of his business, or the *character* of the business, there is a likelihood that harmful conduct of third parties will occur on his premises."[6]

Although the existence of either one of these two situations would give rise to Simon's duty, both are met in this case.

**A.      Simon had both a duty to observe and a duty to intervene to prevent harm from occurring to its invitees when it had reason to know of the "immediate or imminent" harm Maldonado posed as he terrorized mall patrons for 40 minutes before opening fire**

As a business owner conducting business in Washington, Simon's duty to use reasonable care to protect its invitees includes two separate duties to their invitees: (1) a duty to observe and protect and (2) a duty to intervene and protect. The distinction between these two duties was explained in *Nivens v. 7-11 Hoagy's Corner*:

> Similarly, § 344 reflects a duty to observe and a duty to intervene. *The duty to observe is a duty of reasonable care to observe activity on the premises.* The duty to intervene is a duty of reasonable care to prevent or control such activity as is unreasonably hazardous to others, by ejection, restraint, or other appropriate means. The duty to observe may exist whenever the premises are open to the public, but the duty to intervene arises only when a reasonable person in the same circumstances as the defendant would know, to use the words of § 344, that the accidental, negligent, or intentionally harmful acts of third persons "are being done or are likely to be done." In other words, *the duty to intervene arises only when a reasonable person acting under the same circumstances as the defendant would perceive that unreasonable conduct by a third person is impending or occurring, and thus that there is an unreasonable risk of harm to invitees.*[7]

Maldonado's openly erratic and aggressive behavior toward Simon's patrons for 40 minutes created a threat of immediate or imminent harm to Simon's invitees. Maldonado ran into customers, made loud noises, walked around the food court with two weapons strapped across his back, carried a guitar case filled with ammunition, loaded his weapons magazine and

---

[6] *McKown,* 182 Wn. 2d at 768 (emphasis in original).
[7] *Nivens v. 7-11 Hoagy's Corner*, 83 Wn. App. 33, 45-46, 920 P.2d 241 (1996), *aff'd by* 133 Wn.2d 192, 202-03, 943 P.2d 286 (1997) (emphasis added).

PLAINTIFF'S TRIAL BRIEF

Page 14 | No. 3:08-CV-05754-BHS

PVC PFAU COCHRAN
CA VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

smoked a cigarette, all within the common areas of the Mall. Maldonado was not attempting to be discreet with either his behavior or mannerisms; he was trying to get people's attention, and he was hoping someone would stop him.

The actions of Maldonado did not escape the attention of at least three customers visiting the Tacoma Mall that morning. Yet Simon/IPC's security guards who received training in "attentive observation," training in detecting and defusing suspicious people, training to identify "things that look out of place," and even training regarding terrorism, could not have made these same observations because they were not there. There is no indication that there was any security presence within the Tacoma Mall prior to the time Maldonado opened fire at 12:10 p.m. It is also undisputed that Simon lacked CCTV on its property to allow remote observation of the common areas to supplement its low security staffing.

Simon and IPC cannot credibly argue that because its agents failed to personally observe Maldonado during this time that it is not liable for the actions that occurred after he was aggressively stalking its premises for 40 minutes. Simon's and IPC's own policies, procedures, and experiences required a patrol within the common areas, particularly in the food court during meal times—which is precisely where Maldonado began his series of strange and suspicious behavior 40 minutes before he fired his first shot. Had Simon followed its own policies or taken reasonable measures to supplement its deficient staffing with CCTV, it would have observed Maldonado's obviously erratic behavior, as described by at least three lay witnesses, and at the very least been able to keep eyes on Maldonado before he loaded his weapons in the vacant hallway. Simon "had reason to know" of the danger Maldonado posed, which was observed by at least three witnesses, two of whom reported that they were unable to locate a single security guard the entire time they were within the Mall. Simon and IPC cannot willfully place the Mall's security force in an outdoor location that is not even connected to the Tacoma Mall facility, far away from the common areas it was supposed to patrol, and then use this intentional ignorance as a basis to shirk the duties owed to patrons and invitees. A business cannot begin



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799 Facsimile: (253) 627-0654

to attempt to fulfill its duty to observe without providing "a reasonably sufficient number of servants to afford a reasonable protection."[8]  In other words, the business owner must provide *someone* to make observations of hazards on and by people on its property as an initial, reasonable step to satisfy this duty.

The *Nivens* court also described that the "duty to intervene" as described in section 344 is owed by a landowner "if a reasonable person in the occupier's circumstances would foresee that third-party conduct is creating an unreasonable risk of harm to invitees."  Thus, if a landowner "should foresee, in the exercise of reasonable care, that third-party conduct is creating an unreasonable risk of harm to invitees," the landowner has a duty to intervene to protect its invitees.[9]

Simon and IPC should have been aware of Maldonado's conduct during the 40 minutes he remained in the common areas of the mall before he even fired his first shot.  Simon and IPC also should have been aware that Maldonado posed a threat to the safety of invitees.  He was in the food court with a trench coat and carrying a guitar case during lunchtime on a weekend dressed and behaving strangely; he disturbed the restrooms by the food court by making loud noises; he walked quickly, running into Simon's customers as he did so; then he stood in a hallway adjacent to the main corridor of the mall, smoking a cigarette while loading rounds of ammunition into the magazines of his assault weapons.  Unfortunately, Simon and IPC were unaware of Maldonado's activities because both entities failed to have any personnel patrolling the common areas inside the mall before the shooting and because there were no CCTV within the common areas to monitor Maldonado's activities remotely.  Had Simon done either of these, Simon's security personnel could have ejected, restrained, or used any other appropriate means to defuse the situation before it escalated into the shooting.

**B.      Simon knew, or had reason to know, that there was a likelihood of harmful conduct of third parties that could occur on its premises**

---

[8] Restatement (Second) of Torts § 344 cmt. f.
[9] *Nivens*, 83 Wn. App. at 46-47.



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The second situation provided in § 344 and cmt. f of the *Restatement* that may give rise to a landowner's duty includes situations in which the "place or character" of the landowner's business informs the landowner of the likelihood of harmful conduct of third parties that may occur on his premises.  Simon had such institutional knowledge prior to the shooting in November 2005 because of the type of business it conducted and where it chose to do so.

According to a 2006 RAND Report, since 1998 over 60 terrorist attacks at shopping centers had occurred throughout 21 countries around the world, and are "particularly vulnerable to terrorist attacks because of their easy access and dense concentrations of people."  This threatened harm was so great that at least one of Simon's properties did not wait for an actual event to occur before it began taking steps to protect its customers.  Prior to September 11, 2001, Mall of America began to actively prepare for active shooters and other terrorist-like attacks on the mall, upgrading security measures and designing policies and procedures for how to react in case of a realized threat. MOA purchased a new radio communication system, upgraded its fiber optics and CCTV cameras, installed a digital recording system for video and radio recording and redesigned its security center. Post 9/11, MOA contacted security firms to analyze its security practices, to which MOA was directly informed that it needed to be prepared for an active shooter bringing a gun into the mall, assembling the weapon, and firing at people in the area. In response to the security firm's recommendations, MOA designed and implemented a behavioral profiling unit that was trained to mitigate the threat of active shooters and other forms of terrorism.

Simon also implemented a plan for its other malls utilizing U.S. Department of Homeland Security guidance in its "S.H.A.R.P" manual in 2003.  The manual specifically contemplated emergency responses in the event of a terrorist attack.  ***And the likelihood of a shooting event was so foreseeable to Simon that it had already prepared a rote media response for mall representatives to use once the occasion arose at that particular location***.

Five months prior to the Tacoma Mall shooting in November 2005, Simon experienced



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

an active shooter crisis at the Aurora Mall in Aurora, Colorado, in which the rote media response described above was used. The Aurora Mall, which is of similar size and square footage to the Tacoma Mall, had **6 to 7 security guards and off-duty police officers on patrol** the day of the shooting. The mall also utilized numerous CCTV cameras, trained its security team on active shooter protocols and enforced a dress code for mall patrons.

Despite successfully limiting the number of victims and the severity of harm inflicted by the shooters through its use of enhanced security and surveillance, Simon added even more security measures to protect its patrons from future active shooter events. Following the Aurora Mall shooting, Simon increased the number of security officers in the mall and hired additional off-duty police officers to patrol the facility, purchased more security vehicles and installed additional security cameras.

Other malls owned by Simon also implemented emergency response plans that would dictate the security measures deployed if a gunman entered the mall and opened fire. These malls employed multiple proactive measures to deter active shooters: (1) CCTV cameras; (2) a badging system; (3) regular contact with local law enforcement; and (4) regular trainings and drills with security personnel. In fact, Simon considered active shooter events so foreseeable that at least one of the malls it owned and operated entered into an active shooter indemnity agreement with a third-party entity to insulate itself from liability if a shooting ever occurred on its property.

At the Tacoma Mall specifically, Simon knew that a patron being harmed by an active shooter inside the mall was within the general field of danger. Before the shooting took place, IPC already implemented a series of methods to observe suspicious persons and activities. IPC's basic training program first introduced its officers "to the idea of a **Professional Patrol.**" This was the "proactive patrol philosophy of IPC International" in which its guards would "patrol in an active and alert manner, looking to identify and prevent trouble from occurring through attentive observation and immediate and appropriate response."

PLAINTIFF'S TRIAL BRIEF

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

Prior to the incident in 2005, discussions were already occurring within the Tacoma Mall regarding how it was a "soft target" and the possibility of an attack upon it. Simon and IPC adopted new policies and procedures to respond to this threat, such as developing an evacuation point for mall employees and customers. They were also aware of the vulnerability and danger of vacant hallways, as its Mall Manager *twice* advised its tenants of the importance of identifying "anyone suspicious in the back hallways." Despite these warnings, Simon chose to allow the Tacoma Mall to operate with an understaffed security presence and without the assistance of CCTV to put eyes on the common areas with which it had tasked IPC to observe and monitor. Tacoma Mall also had previous experience with "challenging security issues," which needed a police presence.

Simon's business is the development, management, and ownership of retail real estate and shopping centers, and they have long conducted its business at the Tacoma Mall. Simon has become so successful in its business that it owned and/or managed several hundred shopping centers around the world. In analyzing the "place" or "character" of Simon's business, the jury will be asked to conclude that based on Simon's vast institutional knowledge of mall ownership, a shooting on Simon's property was foreseeable, and that an active shooter event was within the general field of danger.

**C.    Once the shooting started, Simon had a duty to intervene and protect its invitees.**

RESTATEMENT (SECOND) OF TORTS § 344, cmt. f provides that a landowner "is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person *are occurrin*g, or are about to occur." (emphasis added). Washington law recognizes a duty to intervene for business owners once a hazardous event is actually occurring. *See, e.g. Christen v. Lee*, 113 Wn.2d at 506 ("The harm of a criminal assault is also foreseeable, however, if the drinking establishment failed to intervene in an assault situation as soon as reasonably possible."); *Miller v. Staton*, 58 Wn.2d 879, 883, 365 P.2d 333, 335 (1961) ("by the exercise of reasonable care for the safety of their patrons, the defendants in the operation of



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

their tavern knew or should have known a fight was ensuing in time to have stopped the fight thereby avoiding the resulting injuries sustained by the plaintiff."); *Passovoy v. Nordstrom*, 52 Wn. App. 166, 172-73, 758 P.2d 524 (1988) (reversing trial court because a jury could have concluded the defendant store's security could have warned the plaintiffs in time for them to protect themselves from a fleeing shoplifting suspect), *review denied*, 112 Wn.2d 1001 (1989).

Once the shooting was underway, Simon and IPC had an obligation to use reasonable care "to prevent or control" the ongoing shooting "by ejection, restraint, or other appropriate means." *Nivens*, 83 Wn. App. at 45. And as acknowledged by the court in *Passovoy*, such "other appropriate means" includes taking reasonable steps to warn Plaintiff of the impending danger so he could protect himself or evacuate. 52 Wn. App. at 172-73. At trial, Plaintiff will provide evidence that Simon failed to do so. While Simon already had in place "evacuation plans" in case of a large-scale emergency, it is undisputed that in 2005 it had no way to actually implement them. Simon had neither a functioning PA system to direct its invitees to safety, nor did they have any CCTV within the common areas to keep eyes on the unfolding harm.

**D.    Assumption of Risk and Contributory Negligence**

The Court is in receipt of extensive summary judgment response briefing and motion *in limine* briefing on the issue of assumption of risk/contributory negligence. Rather than identifying and explaining that issue again in full detail, Plaintiff has elected to provide a short summary of the debate at hand.

At trial, Defendants Simon and IPC will argue that McKown voluntarily encountered a deranged gunman and that he had a full subjective understanding of the risk associated with that choice. Defendants will attempt to narrow the scope of inquiry to how McKown responded once the first bullet rang out and argue that McKown would not have been injured if he hid from the shooter or attempted to escape through the back of a store.

Not only are these arguments completely speculative in nature, but they fail to consider the full context of the situation at hand. At no point did McKown choose to be involved in an



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

active shooter situation. At no point did McKown possess a full understanding of what was happening around him. Argument that he somehow assumed the risk of being shot by holstering his weapon and then entering the mall hallway after a long period of deafening silence is therefore wholly inapplicable.

Further, Defendants Simon and IPC fail to consider the fact that McKown would never have been forced to make a decision on how to respond to an active shooter but for the Defendants' negligence. If Simon and IPC had provided reasonable security measures on November 20, 2005, the Tacoma Mall shooting would have been stopped before any bullets had been fired.

Simon and IPC are also unable to point to any case law supporting the claim that McKown had a duty to hide and/or retreat out the back of the store.  In Washington, RCW 9A.16.020, more commonly referred as the Stand Your Ground Rule, is quite clear in establishing that McKown had every right to defend himself that day. Any argument to the contrary is misguided. As a result, Simon and IPC should be precluded from arguing it further.

**E.      Fault of Others Instruction**

Again, the Court is in receipt of extensive motion *in limine* briefing on this issue. Plaintiff McKown directs the Court to Plaintiff's motion *in limine* (1) Fault of Others for detailed analysis.

**F.      IPC was an Agent of Simon**

In January 2003 defendant Simon Property Group contracted with IPC to provide security for the Tacoma Mall.  Based on that contract, IPC acted as Simon's agent in providing security at the Tacoma Mall.  Simon provided no other security at the mall, other than the security provided by IPC.  IPC's security guards held themselves out as agents of the mall, per IPC's understanding with Simon.

The Court is in receipt of Plaintiff's motion *in limine* on this issue and therefore directs the Court to Plaintiff's motion *in limine* (2) Any evidence or argument that IPC was not Simon's



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

agent. If the Court would like additional briefing on this issue, Plaintiff would be happy to supplement.

**G.     Evidentiary Issues**

    1.     <u>Maldonado Statements</u>

After shooting McKown in the main concourse of the Tacoma Mall, Maldonado walked into the Sam Goody store where he proceeded to hold mall patrons hostage for several hours. One of the patrons stuck inside Sam Goody with Maldonado was an individual named Joseph Hudson.

During the hostage situation, Maldonado admitted to Hudson and the other hostages that prior to loading his weapons full of ammunition in the LensCrafters hallway, he went into the bathroom near the food court and made a bunch of noise hoping that someone would come and stop him.

Plaintiff anticipates that Defendants Simon and IPC will object to the introduction of this statement at trial claiming that it is hearsay evidence under FRE 801 and 802 and that it is merely being brought in to prove the truth of the matter asserted. First and foremost, the introduction of Maldonado's statement should not be considered hearsay as it would not be offered in evidence as proof that Maldonado went into the bathroom near the food court and made a bunch of noise hoping that someone would come and stop him. Plaintiff instead plans on introducing this statement as evidence that Defendants Simon and IPC breached their respective duties to observe suspicious behavior occurring in the mall and protect patrons accordingly. Therefore, it should not qualify hearsay.

Even if the Court deemed the introduction of Maldonado's statement as hearsay, however, the statement would still be admissible under FRE 803 as an exception to hearsay for expressions of intent or plan. It is also admissible under FRE 803(a)(3) as circumstantial proof of Maldonado's state of mind prior to the shooting.  This is directly relevant to countering Simon's and IPC's argument that under no circumstances could such an indiscriminate rampage

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

shooting be prevented. If Simon and IPC adequately satisfied their respective duties to use reasonable care to protect invitees, patrolling security guards would have encountered Maldonado in the bathroom, with his weapons unloaded and with Maldonado in a state of mind that he wanted to be caught and surrender.

Further, Maldonado's statement is also admissible through Plaintiff's liability experts, ER 703, 703, as it was one of the facts Plaintiff's experts relied upon in formulating their opinions.

> 2.   Simon's Pre-Shooting Security Admissions

During the deposition of Gregory Henricks, the former Security Director at Simon's Mall of America property, Henricks testified that in January of 2003, Tom Cernock, the Vice President of Corporate Security for Simon Property Group, asked him the question, "why [do] you want the best security, and it's so expensive, when average security will do?"

Again, Plaintiff anticipates that Defendants Simon and IPC will argue that Cernock's statement, along with a number of other out-of-court statements made by high-level Simon representatives should be deemed inadmissible hearsay evidence. Any such argument would be fruitless as FRE 801 clearly states that statements such as Cernock's, as well as other statements made by Simon representatives made to the media, are not considered hearsay as they are an Opposing Party's Statement under FRE 801(d)(2).

## IV.    DAMAGES

Plaintiff is seeking all damages that are allowed under Washington law.

Plaintiff will present evidence of McKown's damages through his treatment providers and lay testimony.  Dr. Brendon Hutchinson, for example, is one of McKown's long running primary care providers. Dr. Hutchinson, who established care of McKown in 2002, three years before the shooting, will opine as to McKown's condition prior to the shooting, as well as to McKown's difficulties in adapting to life in wheelchair thereafter. Dr. Hutchinson has helped McKown manage his paralysis, colectomy, colostomy, neurogenic bladder, neuropathic pain,

PLAINTIFF'S TRIAL BRIEF



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

muscle atrophy, dysplasia, as well as a host of other issues, and will testify accordingly. He will also discuss the possibility of any future treatment that McKown will likely need.

Plaintiffs' will also present evidence of McKown's damages through lay testimony.  In Washington, lay witnesses are allowed to testify regarding injury, pain, suffering, and disability:

> There is no reason layman may not testify to their sensory perceptions, the weight of the testimony to be determined by the trier of fact. Physical movement by the injured person can be seen and described by a layman with no prior medical training or skill. Furthermore, an injured person can testify to subjective symptoms of pain and suffering, and to the limitations of his [sic] physical movements.

*Bitzan v. Parisi*, 88 Wn.2d 116, 558 P.2d 775 (1977); *see also* Rule 803(a)(1) (present sense impression); Rule 803(a)(3) (then existing mental, emotional or physical condition); Rule 701 (lay witnesses can testify in the form of opinions when those opinions are "rationally related to the perception of the witness.")

Similarly, Plaintiff will present lay testimony to prove evidence of future pain and suffering.  As the *Bitzan* Court held:

> Proof of pain and suffering as late as at the time of trial even though subjective in character will warrant an instruction on future damages. The same is true of proof of disability and lost earnings. The continued existence of these elements of damage at the time of trial permits a reasonable inference that future damage will be sustained. Expert testimony to this effect may also be given but it is not essential ... in cases such as these a future damage instruction can be given even though there is no medical testimony...or even if the medical testimony is contrary to the plaintiffs testimony of continued pain.

88 Wn.2d 116, 122.

Plaintiff will also seek damages for McKown's loss of enjoyment of life, which constitutes a proper and separate element of damages upon which a jury should be instructed. In *Parris v. Johnson*, 3 Wn. App. 853, 859-60, 479 P.2d 91 (1970), the court stated:

> In considering the meaning of the term "disability" we frequently think in terms of impairment of work capacity. That is probably the easiest form of disability to translate into pecuniary loss. There are, however, other activities which are compensable under the general term of disability. "Man does not live by bread alone." Nor does his life consist solely of performing the tasks necessary to buy that bread. In the 24-hour day, one-third may be devoted to work, one-third to sleep and one-third to leisure. An impairment of any one of these aspects of life may constitute a disability.

PLAINTIFF'S TRIAL BRIEF

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

In a footnote at 860 of *Parris*, the court set forth as one of the elements of compensatory damages for personal injury, "physical disability or what is properly referred to as the incapacity to lead a normal life ..."

*Bitzan* also held that the loss of enjoyment of life can be supported by lay testimony. There, the plaintiff's testimony, supported by lay witness testimony, was that his back injury had adversely affected his enjoyment of life, for example his recreational activities. The court held that the lay testimony alone was sufficient to support an instruction on future damages for future disability. In addition, the court held that future damages need only to be proved by a preponderance of the evidence rather than by a standard of reasonable medical certainty or probability.

Finally, mental suffering separate and apart from any physical pain is an element for which damages are recoverable.  An instruction covering this element should be given to the jury. In *Green v. Floe*, 28 Wn.2d 620, 183 P.2d 771 (1947), the evidence showed that the plaintiff had a permanent disability in his knee. In approving the inclusion of "mental pain," the court stated the rule as follows:

> The general rule is that in an action for a physical injury the recoverable damages may include compensation for mental anguish or suffering which results so directly from that injury as to be the natural, legitimate, and proximate consequences thereof.

*Id*. at 636; *accord Cote v. Allen*, 50 Wn.2d 584, 313 P.2d 693 (1957) (court approved the giving of a separate instruction on mental suffering); *Johnson v. Howard*, 45 Wn.2d 433, 275 P.2d 736 (1954) (approved a separate instruction relating solely to "mental suffering"); McCormick on Damages, § 88 at 315 ("Mental pain and suffering in connection with a wrong which apart from such pain and suffering constitutes a cause of action is a proper element of damages where it is a natural proximate consequence of the wrong.")

## V.   CONCLUSION

Plaintiff looks forward to a concise and well-tried case.  Each party has their story, and the jury will decide the damages.

PLAINTIFF'S TRIAL BRIEF

Page 25 | No. 3:08-CV-05754-BHS



PFAU COCHRAN VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654

1

RESPECTFULLY Submitted this 21st day of August, 2018.

2

3                                    PFAU COCHRAN VERTETIS AMALA PLLC

4

5                                    By: ___/s/ Darrell Cochran_____

6                                    Darrell L. Cochran, WSBA No. 22851
                                     Loren A. Cochran, WSBA No. 32773
7                                    Cole B. Douglas, WSBA No. 49786
                                     Attorneys for Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S TRIAL BRIEF

Page 26 | No. 3:08-CV-05754-BHS



1

2

### CERTIFICATE OF SERVICE

I, **Sarah Awes**, hereby declare under penalty of perjury under the laws of the State of Washington that that I am employed at Pfau Cochran Vertetis Amala, PLLC, and that on the below date I caused to be served the foregoing document on:

Pamela M. Andrews
ANDREWS SKINNER, P.S.
645 Elliott Ave. W., Suite 350
Seattle, WA 98119
pamela.andrews@andrews-skinner.com
Attorney for:    Simon Property Group,

Mark J. Dynan
Matthew T. Wood
DYNAN & ASSOCIATES, P.S.
2102 N. Pearl Street, D400
Tacoma, WA 98406
mdynan@dynanassociates.com
mwood@dynanassociates.com
Attorney for:    IPC International Corporations

Rodney B. Ray
MARGULLIS, LUEDTKE & RAY
2601 North Alder Street
Tacoma, WA  98407
roray@mlr-law.com
Attorney for:    Brendan McKown

( ) Via U.S. Mail
( ) Via Facsimile
(X) ECF
( ) Via Email

**DATED** this 21st day of August, 2018.

_/s/ Sarah Awes_____ _____
Sarah Awes

PLAINTIFF'S TRIAL BRIEF

Page 27 | No. 3:08-CV-05754-BHS



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654